[No. A130819. First Dist., Div. One. July 20, 2012.]

ASTER KIFLE-THOMPSON, Plaintiff and Appellant, v.
STATE BOARD OF CHIROPRACTIC EXAMINERS, Defendant and
Respondent.

520

**COUNSEL**

Aster Kifle-Thompson, in pro. per., for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Alfredo Terrazas, Assistant Attorney General, Frank H. Pacoe and Maretta D. Ward, Deputy Attorneys General, for Defendant and Respondent.

**OPINION**

**DONDERO, J.**—In August 2008 the State Board of Chiropractic Examiners (Board) issued a decision revoking Aster Kifle-Thompson's chiropractic license. Kifle-Thompson sought judicial review by petition for writ of administrative mandate, and now appeals the trial court's denial of her petition. She contends the Board's findings are not supported by the evidence, the Board exceeded its jurisdiction and failed to give her a fair hearing, and improperly imposed the disciplinary measure of license revocation.

We conclude the challenged findings are supported by substantial evidence, and find no merit in Kifle-Thompson's other claims of error. We affirm the order denying her petition.

## BACKGROUND

In April 2007, the acting executive officer of the Board brought before the Board a second amended accusation (the accusation) against licensed chiropractor Kifle-Thompson, seeking revocation or suspension of her license in accordance with section 10, subdivision (b), of the Chiropractic Initiative Act (Chiropractic Act) and the administrative adjudication provisions for formal hearing set out in the Administrative Procedure Act (APA).[1] (See Gov. Code, §§ 11501, subd. (a), 11503.) This accusation charged Kifle-Thompson with unprofessional conduct within the meaning of California Code of Regulations, title 16, section 317, subdivisions (e), (k), (*l*), (m), (p), and (q) (hereafter section 317).[2]

More specifically, the accusation alleged Kifle-Thompson was the wife of former licensed chiropractor Steven Thompson, and she had been employed at chiropractic clinics he had owned and operated in Monterey County. In 1997 Thompson was convicted of seven misdemeanor violations of Insurance Code section 1871.4, subdivision (a)(2) (presentation of false or fraudulent claim for workers' compensation), and in 2000 the Board had revoked his chiropractic license based on evidence of insurance fraud relating to his conviction. Kifle-Thompson allegedly, and in connection with Thompson, owned, managed, and controlled a number of business entities described collectively as the "Thompson affiliated clinics."

The accusation set out 35 separate "causes" or allegations of unprofessional conduct. These instances of unprofessional conduct arose from the creation by Thompson and Kifle-Thompson of several sham professional medical corporations—each of which was ostensibly owned and directed by a licensed physician, but was in fact effectively owned, managed, and controlled by "management" corporations created and operated by Thompson

---

[1] The Chiropractic Act is an uncodified initiative measure published in the appendix to Deering's Business and Professions Code. (Stats 1923, p. xx; for § 10, see Stats. 1925, § 10, p. xxiii, as amended by Stats. 1978, ch. 307, § 8, p. 640.) The administrative adjudication provisions for formal hearing of the APA (Gov. Code, § 11340 et seq.) are set out in Government Code section 11500 et seq.

[2] These provisions respectively define unprofessional conduct as (e) conduct that endangers or is likely to endanger the public health, welfare, or safety; (k) any act involving moral turpitude, dishonesty, or corruption; (*l*) knowingly making or signing a document relating to the practice of chiropractic that falsely represents the existence or nonexistence of a state of facts; (m) violating or attempting to violate, assisting in or abetting the violation, or conspiring to violate any provision of the Chiropractic Act (Bus. & Prof. Code, § 1000 et seq.) or the regulations adopted by the Board pursuant to that act; (p) the use of advertising relating to chiropractic that violates Business and Professions Code section 17500; and (q) participation in any act of fraud or misrepresentation. (§ 317.)

and Kifle-Thompson.[3] Thompson and Kifle-Thompson, through these management corporations, professional medical corporations, and affiliated chiropractic clinics, presented to the public, insurers, and other third parties the *appearance* that they were properly constituted to provide both medical and chiropractic services, and engaged in a scheme to submit fraudulent and excessive claims for the payment of workers' compensation and other health benefits.

The accusation noted that these same activities had resulted in an action for civil penalties instituted in 2003 in Monterey County against Thompson, Kifle-Thompson, and the corporations they had formed. The trial court in that case found these defendants had violated Insurance Code section 1871.7, subdivision (b), by submitting fraudulent claims for compensation proscribed by Penal Code section 550, and imposed civil penalties against them in the total amount of $479,115.29. The Sixth District Court of Appeal upheld this judgment in 2006.[4]

The accusation in this matter against Kifle-Thompson was tried by an administrative law judge (ALJ) in Alameda County. The ALJ during 15 days of hearings over six months in 2007, heard testimony and accepted numerous exhibits submitted by both the Board and Kifle-Thompson. (See Gov. Code, §§ 11502, subd. (a), 11506, subd. (c), 11508, subd. (a), 11512, subd. (a), 11517, subd. (a).) On December 31, 2007, the ALJ issued her proposed decision in favor of Kifle-Thompson. (See Gov. Code, § 11517, subd. (c)(1).)

In April 2008 the Board issued a notice of its nonadoption of the ALJ's proposed decision. (See Gov. Code, § 11517, subd. (c)(2)(E).) Two months later the Board set a date for submitting written argument in the matter. (See Gov. Code, § 11517, subd. (c)(2)(E)(ii).) Kifle-Thompson submitted a written argument to the Board dated July 7, 2008. The Board, after review of the transcripts of the ALJ's hearing and the exhibits presented to the ALJ, and consideration of the parties' written arguments, made its final decision after nonadoption of the proposed decision; it sustained a number of the accusation's 35 allegations of unprofessional conduct. On August 5, 2008, the Board

---

[3] The director and officers of chiropractic professional corporations must generally be licensed chiropractors. (Bus. & Prof. Code, § 1055.) A professional corporation, however, that has only one shareholder may appoint officers not licensed in that profession. (Corp. Code, § 13403.) A professional medical corporation, for example, may in this manner have a chiropractor as a *minority* shareholder, appoint a chiropractor as a corporate officer, or employ a chiropractor on its professional staff. (See Corp. Code, § 13401.5, subd. (a)(8).) The professional medical corporations formed by Kifle-Thompson and Thompson were thus alleged to have been *ostensibly* owned by a single licensed physician, who in effect was "leasing" the use of his name for that purpose, whereas the medical corporations were actually controlled by nonphysician officers—Thompson and Kifle-Thompson.

[4] See *People ex rel. Monterey Mushrooms, Inc. v. Thompson* (2006) 136 Cal.App.4th 24, 26–28, 40 [38 Cal.Rptr.3d 677].

sent Kifle-Thompson a copy of this final decision, effective September 4, together with notice of its disciplinary action revoking her license as of that date. (See Gov. Code, § 11518.)

On September 11, 2008, Kifle-Thompson filed a petition for writ of administrative mandate, contending essentially that the Board had exceeded its jurisdiction, failed to provide a fair trial, and had abused its discretion in that its decision was not supported by the evidence. (See Code Civ. Proc., § 1094.5, subd. (b).) In an order dated August 18, 2010, the trial court denied the petition based on an independent review of the evidence. (See Code Civ. Proc., § 1094.5, subd. (c).) This appeal followed.

## DISCUSSION

### A. *Standard of Review*

A writ of administrative mandate is available "for the purpose of inquiring into the validity of any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal . . . ." (Code Civ. Proc., § 1094.5, subd. (a).) The trial court's inquiry in such a case "extend[s] to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5, subd. (b).) Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence. (Code Civ. Proc., § 1094.5, subd. (b).)

When it is claimed the findings are not supported by the evidence, and the trial court, as here, is authorized by law to exercise its independent judgment on the evidence, "abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence." (Code Civ. Proc., § 1094.5, subd. (c).) In such a case our review on appeal is limited. We will sustain the trial court's findings if they are supported by substantial evidence. (*Kazensky v. City of Merced* (1998) 65 Cal.App.4th 44, 52 [76 Cal.Rptr.2d 356]; see *Moran v. Board of Medical Examiners* (1948) 32 Cal.2d 301, 308–309 [196 P.2d 20].) In reviewing the evidence, we "resolve all conflicts in favor of the party prevailing in the superior court and must give that party the benefit of every reasonable inference in support of the judgment." (*Kazensky, supra*, at p. 52.)

Implicit in the foregoing standard of review is the trial court's authority, when conducting an independent review, to reweigh the evidence and make

its own findings. (*Levingston v. Retirement Board* (1995) 38 Cal.App.4th 996, 1000 [45 Cal.Rptr.2d 386].) As noted above, the trial court in this case simply denied Kifle-Thompson's petition, essentially rejecting her contention that the Board's findings were not supported by the evidence. In doing so, the trial court effectively adopted the Board's findings, and hence it is the Board's findings we must examine to determine whether they are supported by substantial evidence.

Finally, we review independently Kifle-Thompson's other claims, that the Board exceeded its jurisdiction or failed to afford a fair trial. (See *TWC Storage, LLC v. State Water Resources Control Bd.* (2010) 185 Cal.App.4th 291, 296 [110 Cal.Rptr.3d 270].)

B. *The Board's Findings*

The Board's final decision included the following general findings. The Board granted Kifle-Thompson a chiropractic license in 1993, after she received a doctor of chiropractic (DC) degree that year. She began working for Thompson in his chiropractic clinic in Salinas later that year. They married the following year. In August 1994 Kifle-Thompson opened her own chiropractic clinic in Seaside, using the same name—Clinica Quiropractica Guadalupe (CQG)—as that used by Thompson for his clinic in Salinas.

In 1996 both Thompson and Kifle-Thompson attended a seminar involving the creation of a professional medical corporation authorized to provide both chiropractic and medical services—commonly termed an "MD-DC corporation." (See Corp. Code, § 13401.5, subd. (a)(8); fn. 3, *ante*.) Soon afterward Thompson incorporated an MD-DC corporation called the Peninsula Medical Group (PMG).

Thompson arranged for Dr. Charles Salzberg, a physician with a full-time practice in Hawaii but licensed to practice in both Hawaii and California, to be the physician "owner" of PMG. Under this arrangement, Salzberg was PMG's president, director, and sole shareholder of record, while Thompson acted as PMG's secretary. However, the documents drafted by Thompson and signed by Salzberg included one giving Thompson all banking authority for PMG, as the sole signatory for its bank accounts. Another document, signed by Salzberg and undated, tendered his resignation as president and director, which Salzberg understood to allow Thompson to terminate their relationship at any time. Thompson, in turn, signed a document in which PMG agreed to indemnify Salzberg for any losses or liabilities resulting from his status as sole shareholder of record. Salzberg further signed a consulting agreement providing that PMG would pay him a monthly consulting fee of $250 in return for his "periodic" review of and submission of recommendations concerning PMG's business policies, procedures, and administration.

By this arrangement Dr. Salzberg effectively agreed to act as PMG's "absentee owner." He understood that he had no actual role either in PMG's operations or its profit distribution; these would be controlled by Thompson through a management corporation. Additionally, Salzberg's oversight of the professional services provided by PMG was minimal—he saw patients at PMG only twice, in the course of visits he made in March and May of 1998, and otherwise merely discussed with Thompson the prospect of hiring other physicians. While he was "owner" of PMG, Salzberg never received any compensation other than his monthly consulting fee and payment for the medical services he provided in March and May of 1998.

Thompson became corporate secretary of Practice Management Systems (PMS) soon after its incorporation in Nevada in November 1996. During the period of November 1997 to November 2002, PMS corporate filings showed that Thompson acted as president, treasurer, and director, while Kifle-Thompson acted as secretary.

PMG began operating at the site of Thompson's clinic in Salinas and Kifle-Thompson's clinic in Seaside in late 1996 or early 1997. PMG began an arrangement with PMS for the latter to provide management services, which included the provision of nonprofessional employees and payroll and management of the facilities, equipment and supplies, whereas PMG handled the professional staff payroll. Thompson and Kifle-Thompson, acting for PMG, hired physicians to work part time at the Seaside and Salinas clinics. One of these, Dr. Julius Mueller, interviewed with both Thompson and Kifle-Thompson, and was hired for PMG under a physician consulting contract that paid by the hour.

In February 1998, Dr. Salzberg signed an application to obtain a fictitious name permit from the Medical Board of California. The application stated he was the sole shareholder, director, president and vice-president of PMG, and sought to use "PMG, Professional Corporation," as a fictitious name at the address of Thompson's clinic in Salinas. The application answered "Yes" to the question whether the "medical practice [was] *wholly owned and entirely controlled by*" the application's signatory, and listed Salzberg, Mueller, and another physician as the medical licensees who would be practicing under the fictitious name. It appeared the application had been filled out by Thompson, and listed him as the contact person; it was unknown whether the application was ever filed with the Medical Board.

At some point Kifle-Thompson began acting as PMG's secretary, at Thompson's request. She submitted "paperwork to the state and probably signed checks on behalf of [PMG]." Thompson signed the salary checks she received from PMG. The Board found that Kifle-Thompson's testimony as to

her involvement with PMG—that she "just saws [sic] patients"—was inconsistent with testimony given in a 2001 deposition, in which she stated she and Thompson were responsible for billings, all of which were done at "the Castorville [sic: Castroville] office." It further found appellant's hearing testimony inconsistent with Thompson's deposition testimony, in which he stated "[m]y wife and I handled the billing."[5]

At the site of the Seaside and Salinas clinics, patients were given a choice of seeing a chiropractor or a part-time physician when the latter was scheduled to work at the clinic. Chiropractic patients were all seen by PMG, unless they were on Medicare or Medi-Cal, in which case they would be seen by CQG, which was an authorized provider for Medicare and Medi-Cal. Although patients were charged the same by PMG and CQG, Medicare and Medi-Cal reimbursed a lower amount; Kifle-Thompson sometimes charged CQG patients on a sliding scale, in some cases only $5.

Dr. Salzberg resigned from PMG in November 1998, after questions were raised about PMG's workers' compensation billings for employees of Monterey Mushrooms. (See fn. 4, ante.) He testified he "regret[ed] his involvement with PMG" as an absentee owner with no control over clinic operations. PMG ceased to provide professional services on January 1, 1999. On that date Kifle-Thompson signed a document assigning all of PMG's patient files, contracts for professional licenses, service agreements, equipment leases, and outstanding accounts receivable to Integrated Family Medical Group (IFMG). The document identified Kifle-Thompson as secretary of both IFMG and PMG.

Kifle-Thompson had incorporated IFMG, a professional corporation, in September 1997. Its address was the same as that of her clinic in Seaside, and a Dr. Joseph Greenspan, a California-licensed physician residing in Texas, was listed as its president, director, and sole shareholder. Kifle-Thompson was listed as IFMG's secretary. Greenspan had signed a document giving Kifle-Thompson all banking authority as sole signatory on banking accounts, an undated document resigning his positions as president and director, and a consulting agreement under which IFMG was to pay him a consulting fee of $3,000 annually. A statement filed with the Secretary of State in September 1998 listed Thompson as IFMG's chief executive officer, with Greenspan as director. Kifle-Thompson was listed as chief financial officer and secretary of

---

[5] The Board's rejection of Kifle-Thompson's hearing testimony—concerning her involvement in PMG—is the one critical instance in which the Board's general findings deviated from the general findings made by the ALJ in her proposed opinion. The ALJ's finding on this issue, by contrast, accepted Kifle-Thompson's testimony that she "just saws [sic] patients" for PMG. The earlier, inconsistent, deposition testimony that the Board accepted was recited by an expert witness who testified at the ALJ hearing.

IFMG. Kifle-Thompson stated she did not know how Greenspan came to be owner of IFMG, but believed it was Thompson who first communicated with him.

After IFMG replaced PMG in January 1999, Kifle-Thompson continued operations at her Seaside clinic as before. PMS provided the same management services to IFMG as it had to PMG. Dr. Mueller was medical director of IFMG and continued seeing patients on a part-time basis. Kifle-Thompson oversaw the clinic's day-to-day operations. Dr. Greenspan, according to her, appeared on two occasions to review patient records and Mueller's credentials. IFMG operated only a few months before Greenspan died—Kifle-Thompson heard from Thompson that attorneys for Monterey Mushrooms had contacted Greenspan, who afterwards said he "wanted to get out" of IFMG. Greenspan reportedly committed suicide.

In August 1999 Thompson sold his CQG chiropractic clinic in Salinas to another chiropractor. The purchase agreement involved both PMS and PMG, and Kifle-Thompson signed a number of the agreements.

In 2001, Kifle-Thompson incorporated Seaside Medical Clinic (SMC), a professional corporation, which began operating at the address of her Seaside clinic, in essentially the same manner that PMG and IFMG had operated. Initially, Dr. Mueller owned 51 percent of SMC's shares, with Kifle-Thompson owning 49 percent. Later Mueller became sole owner and president, with Kifle-Thompson acting as SMC's secretary. In August 2003, Universal Medical Management (UMM) began providing management services to SMC in the same manner that PMS had provided such services to PMG and IFMG. UMM was incorporated in Nevada, and a document filed in that state in October 2003 listed Thompson as president and director and Kifle-Thompson as secretary and treasurer for the period of August 2003 to August 2004. Thompson worked at SMC in an administrative capacity, performing a number of functions not related to patient care.

In March 2007, Kifle-Thompson closed her clinic in Seaside and both SMC and CQG ceased operation.

Following these general findings, the Board's final decision noted the civil judgment against Kifle-Thompson, Thompson, PMG, IFMG, PMS, and other defendants, and the fact that Thompson and Kifle-Thompson had filed for bankruptcy in face of that judgment. (See fn. 4, *ante.*) The Board declined to adopt the findings of the civil judgment, because a higher standard of proof applied in any disciplinary proceeding.

Addressing the 35 specific allegations of unprofessional conduct against Kifle-Thompson, the Board found 12 of these allegations were not supported

by clear and convincing evidence. It sustained, however, the remaining 23 allegations of unprofessional conduct under section 317, subdivisions (e), (k), (*l*), (m), (p), and (q). (See fn. 2, *ante*, and accompanying text.)

Kifle-Thompson had engaged in unprofessional conduct "as an individual and by and through her capacity as an owner and officer of various entities including [PMG] and [IFMG] operated 'sham MD-DC corporations' with medical doctors as ostensible owners, that presented to the public as full service medical centers." In fact, the medical doctors were a series of "absentee figureheads" who gave no consideration for their ownership interests and "for the most part had no meaningful role in the direction of patient care or general clinic operation." Kifle-Thompson, based on her role as an owner and officer of PMG and IFMG, "exercised actual dominion and control over these entities," in violation of the law requiring a "medical doctor" control such multidisciplinary professional corporations. She and Thompson "created a sophisticated, formalized and well-concealed strategy that was formed with the interest of maximizing profits by deceiving patients, payors, the Workers' Compensation System, the public[,] and state and federal government." The Board found that, while the idea of this "strategy" may have originated with Thompson, Kifle-Thompson "was clearly involved in the business arrangement" as an officer of PMG and IFMG, and she "was involved in the finances" of these corporations and their "arrangement with PMS," and had "worked with Thompson to circumvent limitations on third-party reimbursement."

Kifle-Thompson engaged in unprofessional conduct when she conspired with others, including Thompson and several doctors, to form "sham corporations" for "the sole purpose of creating a system whereby she and Thompson could defraud the Workers' Compensation System and insurers." Rejecting her testimony to the contrary, the Board found Kifle-Thompson was an "active participant in this fraudulent scheme," and was "responsible for billings and other business transaction[s] related to the fraudulent scheme."

As an officer of PMG, Kifle-Thompson participated in specific instances of fraudulent and misleading "unbundled billings" relating to one patient during the period between October 1996 and January 1997. These billings were submitted in a manner designed to circumvent workers' compensation rules that limit reimbursement to four procedures or modalities in a single visit, and to prevent the accurate "cascading" of reimbursement (by which workers' compensation claims are reimbursed at 100 percent of the maximum allowable fee for the highest valued procedure or modality, at 75 percent for the next highest, at 50 percent for the third highest, and at 25 percent for the fourth highest). The Board found it irrelevant, either that the patient was seen by Thompson and not Kifle-Thompson, or that Kifle-Thompson was not

listed as an owner of PMG, because Thompson and Kifle-Thompson were "de facto owners"; the physician "owner" received only a nominal payment.

As an officer of PMG, Kifle-Thompson, together with Thompson, was responsible for its billings; she participated in a specific instance of "upcoding," wherein PMG billed for treatment of a patient in October and December 1998 by using an improper code in order to obtain reimbursement at a higher rate.

The Board concluded that, while it had not sustained all 35 allegations, those which it had sustained were "extremely serious." Conceding Kifle-Thompson had presented some evidence in mitigation,[6] the Board found "her conduct during the [ALJ] hearing showed a woeful lack of candor, insight, and honesty." She "repeatedly testified" she·was unable to recall "significant events such as filing an appeal in the civil case and being served an accusation by the Board," and the Board viewed this behavior as "aggravating evidence" it considered in determining the appropriate disciplinary action. Kifle-Thompson had "conspired with others to defraud the Workers' Compensation System by setting up sham medical corporations," "to engage in a pattern of insurance fraud" that circumvented reimbursement limits, and had "shown no remorse or insight whatsoever regarding her illegal conduct"; the Board concluded the appropriate disciplinary action was to revoke her chiropractic license.

## C. *The Board's Findings Are Supported by Substantial Evidence*

Kifle-Thompson's main contention on appeal is that the Board abused its discretion in that its decision was not supported by the evidence. Specifically, she challenges the findings of the Board made in connection with the 23 allegations of unprofessional conduct that it sustained. She reasons these findings show only that she was "somehow involved in the business arrangement, was a corporate officer, and was involved in the finances" of the medical corporations and management corporations created by Thompson, but they fail to establish thereby that she engaged in unprofessional conduct within the meaning of section 317, subdivision (e), (k), (*l*), (m), (p), or (q). The challenged findings further fail to establish why the medical corporations were "sham" or why the billings made by or on behalf of these corporations were "fraudulent." Kifle-Thompson asserts these findings fail to establish that she "did anything" with respect to the specific billings of patients she never saw or treated. The findings also fail to establish that the "unbundling" or "upcoding" was illegal or fraudulent.

---

[6] Kifle-Thompson presented letters from a number of former patients, friends, and associates, describing her as a "king [*sic*], generous, compassionate and skilled chiropractor," and praising her "integrity, hard work, dedication and community service."

We observe, however, that Kifle-Thompson has *not* challenged the general findings made in the Board's final decision. These findings, summarized above, are unquestionably supported by the evidence, and provide, in turn, substantial support for the findings Kifle-Thompson has challenged. The Board reasonably inferred Kifle-Thompson was indeed "clearly involved" in the billing, finances, and business arrangements of PMG, IFMG, SMC, and the two management companies. The general conclusions of the Board show the medical corporations were, in fact, "sham" creations—in violation of state law—in that they were not actually owned and controlled by physicians. Instead, Thompson and Kifle-Thompson exercised actual control and de facto ownership. Perhaps most importantly they demonstrate Kifle-Thompson actually participated in the billing practices of these corporations, and moreover shared responsibility—as a corporate officer—for these corporations' billing practices, regardless of whether she treated a particular patient as to whom billings were made.

█ In addition to the facts established by the general, unchallenged findings, there was extensive testimony at the ALJ hearing, particularly that of expert witness Dr. Michael Stahl, indicating that Kifle-Thompson and Thompson, through the sham medical corporations and management corporations, engaged in a pattern or scheme of fraudulent or excessive billing in violation of the chiropractic standard of care. This same testimony supports the challenged findings related to specific instances of "unbundled" or "upcoded" billing involving particular patients, indicating these billings contained fraudulent misrepresentations designed to maximize profits by circumventing reimbursement limits established by the workers' compensation system and other health plan insurers.

In short, our review of the administrative record leads us to conclude without hesitation that the challenged findings are supported by substantial evidence.

D.  *The Challenged Findings Are Sufficient to Support the Board's Decision*

█ Besides attacking the sufficiency of the evidence regarding particular Board findings, Kifle-Thompson argues the challenged findings fail to satisfy the requirement—articulated by the Supreme Court as one implicit in Code of Civil Procedure section 1094.5—that a final administrative decision "set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order." (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515 [113 Cal.Rptr. 836, 522 P.2d 12] (*Topanga*).) She further urges the Board's conclusions fail to satisfy Government Code section 11425.50, which details the requirements for a

written decision in an administrative adjudicative proceeding subject to the APA. Kifle-Thompson suggests the challenged findings are inadequate on these grounds because they lack "specificity of facts and analysis."

In a separate but similar argument, Kifle-Thompson complains that the challenged findings fail to "apply" the stated facts to the charged violations of section 317, subdivisions (e), (k), (*l*), (m), (p), and (q).

Appellant's claims do not address the sufficiency of the evidence to support the challenged findings, so much as the formal sufficiency of these findings to support the decision. (See Code Civ. Proc., § 1094.5, subd. (b).) In our view such a challenge is without merit. The findings in question are based on the evidence of record and sufficiently state the factual bases for the Board's decision. (Gov. Code, § 11425.50, subds. (a), (c).) Although these findings include restatements of the charges they sustain, an agency's statement of factual basis "may be in the language of, or by reference to, the [accusation]." (Gov. Code, § 11425.50, subd. (b).) Further, it requires no great analytic leap to conclude, from the facts stated, that Kifle-Thompson engaged in conduct proscribed by section 317, subdivisions (e), (k), (*l*), (m), (p), and (q). (See fn. 2, *ante*.) As such the challenged findings are adequate "to bridge the analytic gap between the raw evidence and ultimate decision or order." (*Topanga, supra*, 11 Cal.3d 506, 515.)

E.  *The Board Did Not Exceed Its Jurisdiction*

Kifle-Thompson takes the position that the Board exceeded its jurisdiction because the ALJ ordered dismissal of the proceeding against her. The Board, in her view, had no authority to "undo" or change that dismissal.

On the contrary, the Board was well within its jurisdiction to reject the ALJ's proposed decision, and render its own decision based "upon the record, including the transcript . . . with or without taking additional evidence." (Gov. Code, § 11517, subd. (c)(2)(E).) The ALJ's order of dismissal was a *proposed* order, and one the Board was entitled by statute to "undo." Once the Board determined not to adopt the proposed decision, that decision served no "identifiable function in the administrative adjudication process or, for that matter, in connection with the judicial review" of that process. (*Compton v. Board of Trustees* (1975) 49 Cal.App.3d 150, 158 [122 Cal.Rptr. 493].)

Kifle-Thompson argues the Board also exceeded its jurisdiction because the Workers' Compensation Appeals Board (WCAB) had already adjudicated claims raised by insurer or lien claimants with respect to the billings examined by the Board. In her view the Board was not authorized to make contradictory findings or to "undo" the determinations made by WCAB.

■ Exclusive jurisdiction is vested with WCAB with respect to any controversy relating to the treatment or amounts to be paid for treatment rendered by a physician or other provider to an employee patient whose employer has accepted liability under Labor Code section 4600. (*Bell v. Samaritan Medical Clinic, Inc.* (1976) 60 Cal.App.3d 486, 489–490 [131 Cal.Rptr. 582].) But this was not such a controversy. Rather, the case we review was a *disciplinary* proceeding by the Board to determine whether the billing practices in which Kifle-Thompson participated constituted unprofessional conduct. In doing so the Board was not bound by, nor did its findings necessarily contradict, a WCAB adjudication that had previously determined certain billings submitted by PMG were "not appropriate" in that the billings were unbundled "in what appears to be an attempt to avoid . . . cascading," and that PMG would need to resubmit the billings in an appropriate manner if it wished to pursue reimbursement as a lien claimant.

Additionally, Kifle-Thompson alleges the Board exceeded its jurisdiction by improperly adjudicating both the validity of the administrative functions in which she engaged on behalf of professional medical corporations, and the validity of billings made by those corporations for services provided by physicians. She reasons such issues were properly within the jurisdiction of the Medical Board of California.

This objection, too, lacks merit. Kifle-Thompson was a licensed chiropractor—not a physician—when she participated in the billing and other administrative functions of the medical corporations PMG, IFMG, and SMC. Whether the physicians who ostensibly owned or were employed by these corporations engaged in unprofessional conduct is indeed a matter within the Medical Board of California's jurisdiction, but Kifle-Thompson's conduct in connection with these corporations was squarely within the jurisdiction of the State Board of Chiropractic Examiners.

F.  *Bias of Board Members*

Kifle-Thompson argues the Board acted improperly because it did not afford her a fair hearing in accordance with due process. She reasons most of the Board members were "solo practitioner chiropractors," who had a "financial" or "vested" interest in dissuading other chiropractors from participating in MD-DC corporations despite the fact that such corporations are permitted by state law (see fn. 3, *ante*). She suggests such corporations compete with solo chiropractors by providing a greater scope of services.

■ The APA sets out a procedure by which a party to an adjudicative proceeding may disqualify an ALJ or an agency member—by filing an affidavit specifying the grounds for disqualification. (Gov. Code, § 11512,

subd. (c).) Kifle-Thompson does not contend, nor does the record indicate, that she utilized this procedure to disqualify any of the Board members. Nor does it appear, either from Kifle-Thompson's petition or trial brief, that she raised the issue of bias before the trial court. Under such circumstances such a claim is generally deemed forfeited on appeal. (*Franz v. Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 143 [181 Cal.Rptr. 732, 642 P.2d 792].)

More importantly, Kifle-Thompson has not pointed to any part of the record that would provide factual support for her claim of bias on the part of those Board members who were licensed chiropractors. In the absence of such support her claim has no merit.

G. *Fair Hearing Before the Board*

Kifle-Thompson additionally contends she did not receive a fair trial before the Board because it did not properly consider the "adjudicated facts,"[7] but relied "solely" on written argument provided by the deputy attorney general who prosecuted the accusation—argument she was not permitted to rebut. The Board then made its decision during a closed session from which she was excluded. It is Kifle-Thompson's position that in doing so, the Board violated Government Code section 11517, subdivision (c)(2)(E)(ii) and (iii).

As previously discussed, when an ALJ has rendered a proposed decision under the APA, the agency may, among other options, "[r]eject the proposed decision, and decide the case upon the record, including the transcript . . . with or without taking additional evidence." (Gov. Code, § 11517, subd. (c)(2)(E).) In this event, the agency must, among other requirements, "afford[] the parties the opportunity to present either oral or written argument before the agency itself." (Gov. Code, § 11517, subd. (c)(2)(E)(ii).) The agency's authority to decide the case itself "includes authority to decide some but not all issues in the case." (Gov. Code, § 11517, subd. (c)(2)(E)(iii).)

As we have noted above, the Board properly issued a notice of its nonadoption of the ALJ's proposed decision and subsequently notified the parties of their opportunity to submit written argument to the Board, in compliance with Government Code section 11517, subdivision (c)(2)(E)(ii). Kifle-Thompson, as we have also noted, *did* submit written argument to the Board. It appears Kifle-Thompson was properly served with a copy of written argument submitted by the deputy attorney general on behalf of the Board.

---

[7] Elsewhere in her opening brief Kifle-Thompson also claims the Board substituted "absent facts" and "hearsay" in reaching its decision.

Clearly, the Board decided all the issues in the case, as it was authorized to do under Government Code section 11517, subdivision (c)(2)(E)(iii). The Board's final decision attested it had made its decision "[a]fter review of the entire administrative record including the transcript, exhibits, and written argument from both parties."

We find nothing in the record to support Kifle-Thompson's claim that the Board failed to afford her a fair hearing in compliance with Government Code section 11517.

## H.  *The Board's Order of License Revocation*

Kifle-Thompson claims the Board's choice of disciplinary action— revocation of her license—was improper because it was not in accord with its own disciplinary guidelines.

■ In reaching a decision on a disciplinary action under the APA, the Board is required to consider its adopted disciplinary guidelines. (Cal. Code Regs., tit. 16, § 384.) Yet the Board is also authorized to deviate from these guidelines whenever the Board, "in its sole discretion" determines that the deviation is appropriate under the particular facts of the case. (*Ibid.*)

As we have noted, the Board cited to the "aggravating evidence" that it used in determining its disciplinary action, that is, Kifle-Thompson's conduct during the hearing indicated a "lack of candor, insight and honesty," particularly her "repeated[]" inability to recall "significant events." In our view this is a sufficient statement of its reason for deviating from its disciplinary guidelines,[8] as provided by regulation. (Cal. Code Regs., tit. 16, § 384.)

Further, we note that when, as here, the trial court has upheld the agency findings of unprofessional conduct, and its determination is, as we have concluded, supported by substantial evidence, the determination of appropriate discipline is within the sound discretion of the agency, and we are not free to substitute our discretion in its place. (*Kazensky v. City of Merced, supra,* 65 Cal.App.4th 44, 52.)

---

[8] We note this recitation is also in compliance with the requirements for an agency decision under the APA. Specifically, if a determination is "based substantially on the credibility of a witness" it "shall identify any specific evidence of the observed demeanor, manner, or attitude of the witness that supports the determination, and on judicial review the court shall give great weight to the determination to the extent the determination identifies the observed demeanor, manner, or attitude of the witness that supports it." (Gov. Code, § 11425.50, subd. (b).)

## DISPOSITION

The order denying Kifle-Thompson's petition for writ of administrative mandate is affirmed.

Marchiano, P. J., and Margulies, J., concurred.

A petition for a rehearing was denied August 14, 2012, and appellant's petition for review by the Supreme Court was denied October 17, 2012, S205094.