[No. D059035. Fourth Dist., Div. One. Mar. 26, 2013.]

SAN DIEGO UNIFIED SCHOOL DISTRICT, Plaintiff and Respondent, v. COMMISSION ON PROFESSIONAL COMPETENCE, Defendant and Respondent;
THAD JESPERSON, Real Party in Interest and Appellant.

1122

## COUNSEL

Tosdal, Smith, Steiner & Wax, Jon Y. Vanderpool; Boudreau Williams and Jon R. Williams for Real Party in Interest and Appellant.

Andra M. Donovan and Katherine E. Allison for Plaintiff and Respondent.

No appearance for Defendant and Respondent.

## OPINION

**O'ROURKE, Acting P. J.**—After respondent San Diego Unified School District (District) dismissed appellant Thad Jesperson from employment on grounds he inappropriately touched a student, the three-member Commission on Professional Competence (the Commission) determined District had not proven Jesperson's evident unfitness to teach, immoral conduct, or persistent violation of District regulations. District filed a petition for a writ of mandate with the superior court, which granted the petition and vacated the Commission's decision.

Jesperson appeals from the ensuing judgment in District's favor. He contends substantial evidence does not support the superior court's finding that he touched his accuser "in the manner to which she testified." He further contends the court erred because it did not afford a strong presumption of correctness to the Commission's decision and its credibility determinations,

and it did not make findings that applied the requisite factors relevant to determine his asserted unfitness to teach.

We reverse the judgment and remand the matter to the trial court with directions that it enter a new judgment denying the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

*Jesperson's Employment with District*

Jesperson began teaching with District in 1998, at which time he was given a one-year contract as a "prep time" teacher at Toler Elementary School (Toler). District rehired him as a second grade teacher for the 1999–2000 school year and he continued that assignment for 2000–2001. Jesperson was assigned to a third grade class at Toler for the 2002–2003 school year. During that year, a special education aide, Connie Murphy, worked in his class one-on-one with a student in Jesperson's classroom. Jesperson was well liked by the students, staff, parents, and community.

Jesperson's classroom for the 2002–2003 school year was an aboveground bungalow with a ramp leading to the entry door, desks, a rug for seated activities, and a kidney-shaped table against the wall in the far right-hand corner opposite the entry door. The bungalow had banks of louvered windows with blinds on the east and west sides, which started about three feet from the floor area up to the ceiling. Jesperson always kept the blinds pulled to the top because the windows were the best source of light. He conducted math instruction for Gifted and Talented Education (GATE) students every day at 11:15 a.m. for an hour and 20 minutes. For that instruction, students from other classrooms came to Jesperson's class where he would give direct instruction and then break the students into group work, give them a worksheet, and afterwards have the students line up at his kidney-shaped table standing while he quickly assessed their work. Jesperson cannot hear in his left ear and he is right-handed. However, he recalled that students getting their math assessment lined up both on his left and right sides. Murphy was regularly present during that time because her student was part of that math block instruction.

Jesperson provided one-on-one instruction to students in a YMCA-sponsored program that permitted students in kindergarten through fifth grade to come into the school auditorium before school and after school until as late as 6:00 o'clock in the evening, allowing parents to work. That program occasionally took place in his classroom. Jesperson routinely had a group of students in his room ranging from 10 to 20 students and there were typically no other adults in his classroom, but people were allowed to come in whenever they wanted.

In January 2003, Nellie Goodwin, a guidance aide, reported to Toler's principal, Jane Davis, that a female student's mother complained to her that Jesperson had touched her daughter. Davis called District police and asked for someone to investigate the matter. The next day, Davis was contacted by a mother of a different student who said Jesperson had touched her child on the leg, and Davis advised her police were investigating. Days later, Davis excused Jesperson from school after being directed to do so by a staffing administrator who had been contacted by the San Diego Police Department.

Davis mailed letters to Toler parents on January 24, 2003, and to the parents of Jesperson's students on February 3, 2003. The first letter generally notified parents that the school had removed an employee due to allegations of inappropriate behavior, and that San Diego police were conducting an investigation. The second letter advised the parents of Jesperson's students that Jesperson had been temporarily assigned to another job pending the outcome of an investigation of allegations of inappropriate behavior, and the school had assigned a long-term substitute for the class.

In April 2003, Jesperson was arrested. Thereafter, Davis sent a letter notifying parents that following an investigation, Jesperson had been arrested on several counts of inappropriate behavior with a minor, and that the police department had already notified the parents of the involved students. The letter advised the parents to listen to their children without interrogating them, and to notice any changes in their behavior or words.

*Background of Criminal Proceedings*

In 2004, Jesperson underwent three criminal trials. His first trial commenced in March, after which the jury returned a guilty verdict on one count of lewd conduct with a child involving Emily A., and deadlocked on the remaining 12 counts. The second trial commenced in May on the remaining 12 counts of lewd conduct with a child. The jury returned a guilty verdict on one count involving Jaicee S., but the court granted Jesperson a new trial on that count. The jury returned not guilty verdicts as to counts involving three other girls, and the court declared a mistrial as to another count involving Jaicee, as well as on counts involving Michelle A. and Kelcey H. A third trial commenced in December 2004 on the remaining seven counts of lewd conduct with a child involving Jaicee, Michelle, and Kelcey. The jury convicted Jesperson on all seven counts, and the court sentenced him to seven concurrent 15-year-to-life prison terms plus a concurrent six-year term for the conviction in his first trial.

In September 2007, Jesperson's convictions were reversed on appeal on grounds of a substantial likelihood of juror bias in the first and third trials,

and ineffective assistance of counsel for failure to object to inadmissible or prejudicial evidence in the third trial. Thereafter, the San Diego County District Attorney declined to retry Jesperson.[1]

*District's Notice of Termination and Jesperson's Request for Administrative Hearing*

After his convictions were overturned, District was required to give Jesperson an opportunity for reemployment. In November 2008, District notified Jesperson in writing of its intent to terminate his employment on grounds of evident unfitness for service (Ed. Code, § 44932, subd. (a)(5)); immoral conduct (Ed. Code, § 44932, subd. (a)(1)), and his refusal to obey reasonable regulations prescribed by District's governing board requiring him to maintain a professional relationship with students (Ed. Code, § 44932, subd. (a)(7)). Specifically, District alleged Jesperson had engaged in certain described lewd and lascivious acts with minor students Emily A., Michelle A., Jaicee S., and Kelcey H. Jesperson requested a hearing with the Commission, which took place over the course of three days in January 2010.

*Evidence Presented at the Administrative Hearing*

Among other witnesses, only one of Jesperson's former students, Emily A., testified at the administrative hearing, as did her mother, Emeilia A. Their testimony from the first criminal trial was read into evidence at the hearing, and the Commission had before it Emily's children's hospital interview from May 2003.

*Emeilia's Administrative Hearing Testimony*

Emeilia testified during the administrative hearing that in November 2002, she was playfully tickling Emily in Emily's bedroom and had "touched her leg" when Emily said, " '[T]hat's what my mathematics teacher does to me.' " Emeilia stated she took no action that night, but cried outside of Emily's presence. The next day, Emeilia went to Toler and told Nellie Goodwin, who spoke Spanish, what Emily had said. Goodwin responded that Jesperson was a charlatan and she did not know why he was working at the

---

[1] The administrative hearing officer summarized the above described background of Jesperson's criminal trials to the Commission's other panel members. The hearing officer then explained: "[T]his is a completely new proceeding. It's not a criminal proceeding. What happened in the criminal proceeding you have heard. You are to decide this proceeding based *solely on the evidence presented in this proceeding.* You're not to consider the criminal proceedings, except and unless to the extent, if any, that any evidence from the prior criminal proceedings has come in here. If evidence comes in in this proceeding, you consider it as you deem appropriate, but otherwise you do not. So prior criminal proceedings you just have to forget about what happened and decide this case based on the evidence presented here."

school. Goodwin told Emeilia she would take care of it. Emeilia testified that she wanted to speak with the school principal that day, but Goodwin told her the principal was at a meeting.

That day or another day, Emeilia decided she wanted to meet Jesperson, and she found him and greeted him in a patio area. Emeilia approached Jesperson, who was holding Emily's and another girl's hands, and when she introduced herself as Emily's mother, he replied, "Yes, a very pretty girl, a very intelligent girl." Emeilia testified that Jesperson asked her what she was doing at the school, and she told him she came to the school to help from time to time. After speaking with Goodwin, Emeilia did not try to speak with the principal to complain, nor did she go to police. She spoke about the situation with her husband, and then her family left to vacation in Mexico during the month of December.

Emeilia testified that in March or April 2003, she received a telephone call from a police officer who asked her questions about the situation. She was asked for permission to have Emily interviewed at school. She did not speak with anyone else regarding the matter until she was called to testify at Jesperson's criminal trial.

On cross-examination, Emeilia was asked to describe how Emily showed her the touching. She described it as Jesperson passing his hand up Emily's back with his hand flat, and touching the side of Emily's right leg on the upper thigh with his thumb pressed on the front part of her hip.[2] Emeilia admitted that Emily continued to get math instruction with Jesperson after telling her about his touching her on the leg, and Emily never said she did not want to work with him anymore. Emeilia explained that the word "charlatan" meant playful, and that when Emily told her Jesperson played with her, she told her mother he did so not just with her, but "[w]ith all of us." Emeilia believed Emily had testified in the criminal trial that Jesperson had touched her between her legs in her private part. She admitted she had retained a lawyer to sue Jesperson, but stated they did not receive any money from the lawsuit. On redirect, Emeilia explained that her case was dismissed as untimely.

---

[2] Jesperson's counsel asked Emeilia, "Was she showing you on this part of her leg (indicating)?" and Emeilia answered, "Yeah, this one." This colloquy followed when the hearing officer sought to clarify the record as to the word "this": "The Hearing Officer: The record will reflect this is the side of the right leg. [¶] [District counsel]: The upper thigh? [¶] The Hearing Officer: The thigh, upper thigh. [¶] [Jesperson's counsel]: And I want to ask you, it looked to me, Mrs. [A.], you were pressing your thumb on the inside of her hip? Not inside, on the front part? [¶] [Emeilia]: Yes."

*Emily's Administrative Hearing Testimony*

Emily, who was 14 years old at the time of the administrative hearing, testified that she "somewhat" remembered the events from 2002 and 2003. She admitted that before the hearing, she had read a trial transcript as well as a September 3, 2009 declaration she had signed that was written by District's counsel. She stated that everything in that declaration was accurate.[3]

Emily testified that in third grade she participated in the GATE program in math, which required her and other students to go to Jesperson's classroom for instruction at certain times of the day. Jesperson would give the students an assignment or teach a lesson, and they would get their work checked by going to Jesperson while he was sitting at his desk. Emily testified, "[W]e would go and get our work checked, and I just like—he would like touch us and stuff." When asked what part of her body Jesperson touched, she said, "Like my legs and my back." She testified Jesperson touched her legs high on her right thigh or low buttocks, and also on her lower back; she did not remember how many times it happened to her, but it happened "more than like a few times." She stated Jesperson put his hand inside her pants and over her underwear in the back, but did not touch her skin directly. According to Emily, Jesperson only touched her in the back, not the front, and he would move his hand around while he was checking the work. When asked the period of time the touching lasted, she stated, "Well, depends, but like a minute maybe." Emily also testified that Jesperson touched her on her lower

---

[3] Emily's September 2009 declaration was largely consistent with her administrative hearing testimony. In it, she states in part: "When Mr. Jesperson was correcting or checking my math sheets at the back table, on more than one time and almost every day, he touched me in my private areas. I would be facing bookshelves that were underneath the classroom windows when the touching happened. Other students would be in the classroom at their desks, but they were not sitting right next to me when the touching was happening. I do not remember whether the touching happened in other parts of his classroom. When I wore pants he placed his hand under my outside pants and over my panties. His hand would be over the part of my panties that covered my back area. When I wore a dress he would place his hand under my dress, between my legs and over my panties over my back area. I do not remember whether or not his hand touched my skin. I do not remember whether he touched me over my underwear that covered the front part of my body. When he touched me his hand would be moving. Mr. Jesperson did not put his hand under my underwear. If I wore a shirt he would place his hand under my shirt and slide his hand up from the bottom of my back. He also did that from the top of by [sic] back sliding his hand down. I would let him place his hand inside my pants. I don't know why I did that. [¶] . . . I do not remember whether or not I told someone right away about this touching, but I think I told a friend. I did not tell my mother about the touching until two months had passed. I did not tell her sooner because I thought she would be mad. I do not remember whether I told anyone at the school about the touching when it was happening. After I was interviewed by a detective about the touching I told other friends at recess or in the bathroom. My mother was the first adult I told about the touching. My mother asked me how did he touch me and told me to tell Mr. Jesperson to stop. I wanted to tell him to stop but I never did because I was too scared. The touching by Mr. Jesperson stopped when he was arrested."

back, and stated she thought it was under her clothing or shirt. When asked whether it was skin-to-skin or over her shirt, she said, "I really don't remember."

Emily testified Jesperson would be sitting and she would be standing when the touching occurred. According to Emily, this happened more than once on different days, during regular classroom time with his students and other GATE students present. She admitted no other students told her they saw what Jesperson was doing to her. Also, Emily acknowledged Murphy would be in the room helping her special needs student during the times the touching occurred. When asked whether she had talked to her mother and what Emily had said, Emily testified: "I don't remember exactly, but from what my mom tells me, that we were playing tickle, and she was tickling like my legs and my back, and then I said something like, Oh, that's what my teacher does to me." She stated she did not know whether what had happened was a right thing or a wrong thing at the time, but she thought Jesperson was nice and friendly, and she was "pretty sure" her grade in math was good. She never spoke with the principal or school counselor about the touching after it happened. She never spoke with Jesperson about the touching.

After Jesperson left the school, Emily thought she recalled talking to other students about the touching, but did not remember what she said or who she spoke with. She recalled speaking at school with a female detective, San Diego Police Detective Kim Newbold, about a month after he left. Emily testified she also recalled being interviewed on videotape at Children's Hospital, but did not remember anyone else interviewing her after that. When asked whether she was interviewed by the district attorney, Emily testified she thought so, once or twice. She also testified more than once at Jesperson's trials. Emily stated that none of the people who interviewed her told her what to say or planted stories in her head about what had happened. She told the panel that everything she said was the truth and what she remembered.

On cross-examination, Emily admitted that at times she had held Jesperson's hand while at Toler, and that there was never a time when Jesperson wanted to hold her hand or touch her back or leg that caused her to move away or made her feel "weird." She testified she never really said anything to her mother other than what Jesperson did, she did not tell her mother she wanted to avoid him. She testified that she was sometimes scared at night, and would sleep with both a nightlight and the lights on in her room. Emily admitted that she denied being touched the first time an interviewer talked to her.

According to Emily, Jesperson would touch her while he was writing with a pen in one hand and looking at her work. She initially could not remember

whether she stood on Jesperson's left- or right-hand side, but then stated she thought she stood on his left. Emily testified that she thought at the first trial she had said Jesperson had touched her private parts, and that she considered her upper thigh, "butt area" and the area between her "butt" and legs private. She recalled that Jesperson touched her on the thigh and between her legs, but not in front. When asked what sort of touching it was, she said, "It would be a rub." When asked whether Jesperson ever squeezed her buttocks, Emily responded, "I don't think so." Emily acknowledged that while she was in third grade, she was subjected to "good touching" like a pat. She agreed she was sick of people other than her mother and father asking her about what had happened.

Answering the hearing officer's questions, Emily could not recall whether she was uncomfortable at the time Jesperson was touching her in the classroom. At the time he touched her, she did not have a feeling as to whether it was right or wrong but later, after the court proceedings and when people explained it to her, she began to feel it was wrong. She also testified that she would sleep with the lights on in her bedroom after watching a scary movie.

### Emeilia's Testimony from Jesperson's First Criminal Trial

Emeilia testified at Jesperson's first trial that in November 2002, Emily told her "her teacher" would tell her she was very pretty, and that he would touch her leg and back. She told Emily to tell him to stop. Emeilia explained that Emily described Jesperson tickling her on her back, with his right hand on her back under her shirt and moving his outstretched fingers back and forth. Emily told her mother not to worry, that Jesperson was "a very playful person" and he did that with all the kids.

Emeilia testified about her conversation with Goodwin, and the fact she met Jesperson at the school while he was with the whole class and "holding a girl by the hand." According to Emeilia, Goodwin replied that Jesperson was a "joker" and she did not know why he was a teacher. Emeilia stated she had a conversation with Emily about the matter that same month, but could not remember the date.

According to Emeilia, she and Emily next spoke about the subject in May 2003 after Emeilia received a call from the police and from someone telling her about an appointment at Children's Hospital. A school representative told her that Emily had reported being touched, and Emeilia learned how she was touched when they went to the hospital. Emeilia denied telling Emily what to say to detectives. Emily did not receive counseling at that time, but was in counseling at the time of the trial.

*Emily's Testimony from Jesperson's First Criminal Trial*

Emily testified at Jesperson's first criminal trial that when she was in third grade and taking math from Jesperson, Jesperson touched her in his class-room more than once. She described the touching as on "my private part, my back, my legs, and I'm not sure about my neck." When asked to describe her private part, Emily stated, "Like over my underwear or something like that." According to Emily, Jesperson would stick his hand inside her pants on the back. She let him do that and did not really know whether it was good or bad touching. Emily stated the touching occurred while she was standing and he was sitting at a desk checking her math sheets. Emily testified she thought Jesperson touched her on her back under her clothes, but she could not remember feeling his hand on her skin. He would touch her on the back of her legs. Jesperson did not touch the front part of her body.

Emily used a doll to describe Jesperson's touching. She motioned her hand down the back of the doll, and slid her hand from the bottom of the doll and up. She also slid her hand from the top of the doll, sliding down. She demonstrated how Jesperson stuck his hand inside her pants, and counsel described it: "For the record, the witness is taking her hand and putting it in between the legs of the doll, over the underwear, underneath the outer clothing of the doll, but underneath—she is taking her hand and putting it between the legs of the doll, over the blue underwear of the doll, but underneath the red skirt of the doll." Emily denied that Jesperson ever put his hand underneath her underwear. She stated Jesperson's touching felt like he was tickling her.

Emily testified that she did not tell her mother about the touching until two months later because she thought her mother would be mad. She recalled telling a female detective about the touching, and she thought she told her friend Gemma.

On cross-examination, Emily testified she had first told the detective that no one had touched her in a bad way. She thought she had done so because she did not know the difference between a bad touch and good touch. After the detective spoke with her again, she knew about bad touching. Emily testified her friend Gemma also told her that the way Jesperson touched her was "bad." Emily told other friends, Maria, Aimee, Rosa and others, about the touching at recess or in the school bathroom. Emily thought Aimee asked her questions about it.

According to Emily, the touching occurred "[a]lmost every day" when she went to Jesperson's desk so he could check her work. She recalled her mother talking about a letter that had come home from school about the touching,

and thought she first told her mother about the touching after that letter arrived. After the letter was sent, Emily's mother asked her a lot of questions about the touching, and Emily got tired of them.

On redirect examination, Emily denied that any touching occurred down or up the front of her shirt. After she told her mother about the touching, her mother told her to tell Jesperson to stop, and though she wanted to, she never did because she was scared and did not want to talk to him.

On recross-examination, Emily admitted there were times when other students were waiting in line for their papers to be corrected. On the second redirect examination, she testified when the touching occurred there were no students "sitting right next to [her]."

### Jesperson's Administrative Hearing Testimony

Jesperson testified that he first met Emily when she came to his class for GATE math instruction during the 2002–2003 school year. Emily came every day along with maybe as many as eight other students. Jesperson explained that he began with direct math instruction for 15 to 20 minutes while the students were seated on the floor, then broke the students into groups to work for another 20 minutes. The students would then be given a worksheet, and during the last five or 10 minutes before the class ended, they would line up at his kidney-shaped table to have it checked off. He stated there was not always a line at the table because that would depend on how quickly the students would finish their work. Though he admitted touching Emily's back, he denied ever touching her underwear or her legs. He denied touching Emily at the hip at the top of her thigh as Emeilia had described, and denied ever tickling Emily at any time. Jesperson testified he never deliberately stroked Emily's back, explaining, "It's a very dynamic situation, and a pat on the back, I mean, you know, a shake of the hand, something to that effect, a very quick thing like that, that would be the only touching, only nurturing or supporting way." Jesperson testified he touched Emily's back over her clothes, but never touched her under her shirt or on the skin of her back.

Jesperson testified he met Emeilia on one occasion as he, Murphy and kids from his classroom were walking to the lunch area after math. He testified it was rare that he would not be holding a student's hand during that time while they walked in a line to go somewhere. Emeilia introduced herself, exchanged some pleasantries and left, though he imagined she stayed behind with Emily. Jesperson, who was conversant in Spanish at the time, did not recall whether the exchange took place in Spanish or English. According to Jesperson, during that time, Goodwin would have been standing near the lunch tables watching over the students eating lunch. Jesperson testified that

his contacts with Goodwin were limited to seeing her in the hallways before or after school, and once in a while when she would deliver a message from the office to his bungalow. The prior school year, he saw her at least once a day because her granddaughter was in his classroom. Jesperson testified that Goodwin never approached him with any criticisms. He did not hear as of November 2002 that she harbored any animosity towards him.

Jesperson also recalled helping Emily tie her shoe sometime during the 2002–2003 school year, and remembered it because she was the only third grader or second grader who could not tie her own shoe. This happened during math instruction with the rest of the classroom present. He faced her while doing so, looking at the front of her shoe towards her, not hunched over her back.

After meeting Emily's mother, Jesperson did not notice any difference in how Emily reacted or interacted with him, and she continued to come to his class for math until the end of the year break in 2002.

On January 17, 2003, Davis told Jesperson she needed to talk to him in her office in private, and told him two of his students had accused him of inappropriate touching. As of January 21, 2003, Jesperson was reassigned to a media center and worked there until his arrest in April 2003. At some point while there, he received a call from Detective Newbold, who asked him if he would meet with her that day after work. He initially agreed, but told her he would have to contact his union-provided counsel first. After speaking with his counsel, he did not meet with her.

On cross-examination, Jesperson admitted that from the ground, it was not possible to see into his bungalow other than through the front door. He agreed there were times when Murphy was not in his classroom with her student during math. During the second week of the 2002–2003 school year, a District counselor came to his classroom to discuss an individualized education program involving one of his students when Jesperson saw she had a "Good Touch/Bad Touch" presentation. She indicated she was behind schedule and apologized, and he told her it was not necessary for her to come to his class because he had already covered that topic as he had done in prior years.

Jesperson testified that Emily was mistaken about him touching her underwear and her legs. He testified she was mistaken about him touching her upper thigh and tickling her back. He testified that the only touching he had ever done to Emily was to pat her on the back; he never deliberately stroked her back. According to Jesperson, none of the touching described by Emily happened; only innocent touching such as patting on the back occurred.

In response to the hearing officer's questions, Jesperson testified that when he told Detective Newbold that he wished to talk to his attorney before speaking with her, she paused and essentially responded, " 'Fine. If that's how you want to play this game, then that's what we'll do.' " He did not recall the rest of the conversation, but testified it was one of the most frightening things that had ever happened to him, that he felt like he was "being hunted . . . ." Jesperson testified that while in the detention facility, he had been served with a civil lawsuit brought by Emily against him and District but he did not participate in any proceedings, he was not deposed, he and his family did not pay any money, and to his knowledge, the matter never went to a jury. He stated that other lawsuits were filed against him.

### Testimony of Connie Murphy

Murphy testified that she met Jesperson in September 2002 and worked with him in his classroom daily until his removal on January 17, 2003. She was a special education assistant for an autistic third grade child for the 2002–2003 school year. Murphy was present early before school until about 3:30 p.m. when the bus picked up her student. There were occasions when her student had other activities or situations requiring him to be outside Jesperson's classroom, but it ranged only from 10 to 30 minutes at a time. Her student participated in Jesperson's math block instruction, and she was there for those periods unless he was taken out for other reasons. During math block, however, she would leave Jesperson's classroom two to three times a week, typically once for only five to seven minutes in order to drop her student off for other therapy. While her student worked on his tasks, Murphy went around the room and assisted other students as the need arose. She recalled the blinds were always up in Jesperson's classroom.

During Jesperson's GATE instruction period, the students did their work and then approached his kidney-shaped table and stood next to him. She either walked around the classroom or was assisting her student during that time, and if she was attending to another student, she always watched the entire room because she had to make sure her student was working correctly. Murphy testified that she observed Jesperson touch students "[l]ike a pat on the back, good job, you know, on the shoulder, on the arm." She saw him hug students as well, both by him bending down to give a student a hug or by students jumping up to hug him, and she described him as very gentle. Murphy also saw him hold some of his third graders' hands, typically when a child came up to him and during lunchtime when the teacher would lead students to and from the lunch area.

Murphy testified she helped Emily every day at recess tie her shoe, which she thought was odd given Emily's age. She recalled seeing Jesperson once

help Emily tie her shoe in his classroom. Murphy recalled seeing Jesperson touch Emily during his math block, but only the sort of touching that she had described. She never saw Jesperson touch Emily in the manner Emily described (on her leg or her buttocks or back below the waistline of her pants outside of her underwear), and Emily never came to her to say she was uncomfortable around Jesperson.

In approximately October or November of 2002, Goodwin approached her and asked her if she had noticed Jesperson had touched any of the students. Murphy said yes and explained how they were trying to teach Emily how to tie her shoe. That was an event that Murphy recalled because it had recently happened. Murphy's conversation with Goodwin was brief: five minutes or less. After Jesperson had been removed from the school, Goodwin approached her again and asked her if she remembered their prior conversation. When Murphy responded that she did, Goodwin was adamant that "she didn't want me to say anything to anyone about that, to just forget it." Murphy asked Goodwin if that was the reason why Jesperson was not at school any longer, but Goodwin did not respond and their conversation ended. Murphy testified that she had heard Goodwin criticize Jesperson "[t]oo many [times] to count" beginning within the first week she started at Toler until after Jesperson was removed. Specifically, Goodwin told Murphy that she "hated" Jesperson, referred to him as a "joker" and a "lousy teacher" and she wanted him "out of there." Murphy refuted it, telling Goodwin he was a good teacher. When Murphy asked Goodwin why she felt that way, she did not explain.

Murphy did not recall any change in Emily's emotional or physical demeanor or attitude after Jesperson was removed. She recalled students, including Emily, chatting about the situation in the classroom, on the playground or at lunch tables, and as a result Murphy asked Jesperson's replacement teacher, Jane Badger, how to deal with the talk. Badger spoke with Davis about it. Murphy testified that she was interviewed for 20 to 30 minutes at some point by Detective Newbold. Murphy described the detective as "very intimidating" and stated the detective used her body to intimidate during questioning by leaning toward Murphy—about a foot away from her face—and changed to an angry tone of voice when she did not like Murphy's answer. Murphy had told Detective Newbold she had never seen Jesperson touch any child inappropriately.

### Testimony of Jane Davis

Davis testified that she saw Jesperson touch students and saw students hug his arm, but she did not feel such touching was inappropriate. She never saw

Jesperson touch any student's back or leg, and no student or parent ever complained about Jesperson inappropriately touching their student during summer school.

Davis confirmed that Murphy's special education student was "full inclusion" in the GATE program, so during Jesperson's GATE math sessions, Murphy would have been in the classroom. Murphy never complained to Davis that Jesperson was touching kids in an inappropriate or wrong manner.

Davis sent out the January, February and April 2003 letters notifying parents about the situation. She recalled that neither Emily or her mother, Emeilia, complained to her about any touching before the January 2003 letter. Once the initial allegation came to her, she did not interview any of the girls who came forward or talk to their parents; all of those matters were handled by Detective Newbold and the San Diego Police Department.

### Testimony of Jane Badger

Badger took over Jesperson's class after he was removed from the school. She never noticed any behavioral problems in Emily.

After Davis's April 24, 2003 letter went out to parents, a group of students came to her and one of them, Aimee, reported that a letter had been sent to their homes and asked about the words in the letter. It became apparent to Badger that some of the Spanish-speaking students, not including Emily, were trying to translate the letter for their parents. On April 28, 2003, Badger wrote a note to Davis stating, "[T]he kids told me that Emily A[.] is spreading a rumor that [Jesperson] touched her on the legs and neck. Perhaps, we might want Emily [A.] to handle this in a more appropriate manner." Badger wrote on the note that it was "Aimee" who spoke with her. Badger did not talk with Emily, but went to Emily's regular teacher and expressed concern that the children were "doing a lot of talking together in little groups, and [she] was concerned that it needed to be handled appropriately, and the children needed to understand how to handle this better . . . ." Badger asked the teacher to speak with Emily. Badger testified that the students' "chatty talk" about the situation continued the whole time she was there.

On cross-examination, Badger recalled that in general the students were talking about why Jesperson was not at school, about visiting the children's hospital with each other, and about getting to miss school with each other.

### Emily's May 8, 2003 Children's Hospital Interview

The Commission had before it a transcript of Emily's recorded interview by Gabriela Lainez, a social worker at the children's hospital, that took place

on May 8, 2003. Emily told Lainez her mother had told her she was going to talk about Jesperson, and that her mother had informed her he was in jail after her mother talked to police and told them he "always touched me." Emily described Jesperson as touching by putting his hand under her clothes "every day" starting one week after school started. She told Lainez he put his hand under her shirt and sometimes under her pants on her "private part,"[4] describing it as the place where she went to the bathroom, but that the latter touching under her pants "only happened like four times." She stated when he did that, he tickled her "in my legs, around my back." The touching occurred on top of her underwear. According to Emily, Jesperson tickled her on her back under her shirt every day. During those times, she was standing in the classroom next to Jesperson at his desk while he was sitting in his chair, and Murphy would be on the other side of the classroom. Emily said she made "excuses" to Jesperson to get him to stop. Emily told Lainez that when Jesperson touched her, he would say, "You did a great job."

*The Commission's Decision*

On January 27, 2010, the Commission met in closed session and reached a unanimous decision to dismiss the accusation and statement of charges. In an approximately 12-page written decision, it explained the issues and the background of Jesperson's employment and detailed the chronological events leading to Jesperson's arrest as well as the witnesses' testimony. The Commission concluded "[t]he evidence considered as a whole was insufficient to establish that [Jesperson] touched Emily in the manner to which she testified." Though the Commission stated it was confident Emily did not lie at the administrative hearing, it found her testimony from the criminal trial and administrative hearing "presented a number of concerns, none of which viewed in isolation would perhaps have been that significant, but which when considered collectively raised substantial concerns as to her credibility." It explained: "First, [Emily] stated that the inappropriate touching occurred

---

[4] Indications are that when Emily referred to her private parts, she was referring to her buttocks and back. The interviewer pulled out a doll and the following colloquy occurred: "[Lainez]: Okay, first on this doll can you show me where your private is that you told me? [¶] [Emily]: Right here. [¶] [Lainez]: Right there, okay. [¶] [Emily]: But he would not touch me here, he would touch me right here. [¶] [Lainez]: Okay, what is that called? [¶] [Emily]: My butt. [¶] [Lainez]: Your butt, okay, all right. Is there um, is there any other private parts of your body? [¶] [Emily]: Um, yes. [¶] [Lainez]: Where? [¶] [Emily]: On my back. [¶] . . . [¶] [Lainez]: Okay, that's private, and what else? [¶] [Emily]: Um, I also had um, um, um . . . what do you call it, um . . . legs. [¶] [Lainez]: Your legs are private too? [¶] [Emily]: Well um no, but um I also have the legs and he touched them." When asked what other private parts she had, Emily said that was "Pretty much it." Emily then described how the touching occurred using the doll, telling Lainez that Jesperson would push his hands in and under her pants, and also touch her legs and back, but nothing "in the front." The joint exhibit list for the administrative hearing only lists the interview transcript, it does not identify any videotape of Lainez's interview.

while other students were in class and standing nearby. She also stated that the touching occurred every day. Even if this meant only 'frequently,' it implies that the touching occurred on numerous occasions when another adult—special education aide Connie Murphy—was in the classroom. Yet Murphy testified that she never observed any kind of inappropriate touching. In addition, Emily described [Jesperson] as touching her with one hand while he was correcting her math assignment with the other, which seems an awkward way in which to engage in such conduct. Also of note, the touching did not appear to bother Emily at the time it occurred. She first reported it to her mother in what can only be described as a lighthearted fashion, while she and her mother were happily engaged in affectionate play. Emily did not consider the touching to be 'bad' touching until much later, after Detective Newbold and perhaps others told her that this was the case. Emily's statement that she was initially afraid to tell her mother because she thought the latter would be mad seemed inconsistent with initial lack of awareness on Emily's part that the touching was bad. It appeared, too, that the timing of Emily's more serious statements coincided with letters Toler parents received from the school. Finally, Emily's demeanor while describing the touching at the administrative hearing was without significant emotion." The Commission expressed concern about the lack of corroboration from any other alleged victim.

The Commission also expressed concern about Emily's mother Emeilia's testimony; it found her demeanor suggested she was "perhaps overdramatizing the events. . . ." The Commission found Emily's disclosure "must have been very benign" because Emeilia did not originally contact the police, and Goodwin did not take action herself, even though she "clearly had a strong disliking" for Jesperson. It noted Emeilia later never went to the police, but instead filed a civil lawsuit on Emily's behalf, which "suggested a possible initial bias on Amelia's [sic] part, which could have influenced, consciously or otherwise, Emily's perception and description of [Jesperson's] conduct." The Commission was concerned about Detective Newbold's potential influence on Emily's recollection, finding she "appeared to have conducted a decidedly aggressive and not necessarily impartial investigation of the allegations against [Jesperson]."

On the other hand, the Commission found that Murphy came across as "very credible" and relaxed, and observed she readily admitted when she did not recall a particular detail. It found Murphy "seemed to be attempting to answer every question in a direct and truthful manner to the best of her recollection." The Commission noted that Murphy had an unobstructed view from her desk to Jesperson's kidney-shaped table. Likewise, the Commission found nothing in Jesperson's demeanor or testimony that "negatively reflected on his credibility."

The Commission stated: "While the evidence established that [Jesperson] was physically affectionate with his students, and that he touched Emily (and other students), the evidence did not establish that he touched her in the manner to which she testified, or in any other manner that was immoral or a violation of district regulations, or that demonstrated an evident unfitness to serve."

*District's Petition for Writ of Mandate*

District petitioned the superior court for a writ of mandate (Code Civ. Proc., § 1094.5) seeking to set aside the Commission's decision on grounds its decisions on the charges were not supported by its findings, and its findings were not supported by the evidence. District asked the court to direct the Commission to issue a decision finding Jesperson's conduct constituted cause for dismissal and established he was unfit to teach.

The court tentatively granted District's petition in part and denied it in part, asking the Commission to set aside its order dismissing the charges and "reconsider its Legal Conclusions 6 and 7 in light of the Court's finding above that Mr. Jesperson touched Emily in the manner to which she testified."[5] It found the Commission's findings unsupported by the administrative hearing testimony, and contrary to the weight of the evidence. Writing that the Commission "may have benefitt[ed] from the transcript of the hearing," which was not completed until after its decision, the court ruled that some of the Commission's statements were not supported by the transcript and that the transcript showed Emily had actually testified she could not remember whether inappropriate touching occurred while other students were standing in line nearby, and could not remember whether there was a time Jesperson did not touch her while he graded her work. The court stated Emily had not testified that the touching occurred while other students were standing nearby, nor had she testified that his touching occurred every day.

As for its assessment of Emily's credibility, the court stated: "This Court's review of the testimony of Emily is assisted by the undersigned judicial officer's three years of experience as a judge sitting in juvenile court, where he received and weighed the testimony of hundreds of minors under oath." The court found Emily A.'s testimony credible given her age at the time of the administrative hearing, her age at the time of the incidents, and the nature

---

[5] The Commission's legal conclusions Nos. 6 and 7 read: "6. The Commission concluded that the evidence did not establish respondent's unfitness for service, immoral conduct, or a persistent violation of district regulations. These conclusions necessarily follow from the Commission's findings, and in particular Finding 33. [¶] 7. By reason of Findings 1 through 33, and Conclusions 1 through 6, cause does not exist to dismiss respondent from his teaching position with the San Diego Unified School District."

of the incidents. It disagreed with the Commission's conclusions concerning Emeilia's credibility and conduct, finding her testimony credible and her conduct understandable under the circumstances. Thus, the court found the evidence established Jesperson touched Emily in the manner to which she testified.

After supplemental briefing on whether it had authority to, and should, remand the matter to the Commission, the court entered a final judgment in the matter in District's favor. In its final order, it ruled: "Having considered the *Morrison* [*v. State Board of Education* (1969) 1 Cal.3d 214 [82 Cal.Rptr. 175, 461 P.2d 375]] factors, the Court concludes that Mr. Jesperson touching Emily in the manner to which she testified constitutes immoral conduct making him unfit to teach."

The court eventually entered a judgment in District's favor reversing the Commission's decision, affirming the accusation against Jesperson and his dismissal from employment for the reasons set forth in its November 30, 2010 minute order, and ordering the parties to bear their own costs and fees.

Jesperson timely filed this appeal.

## DISCUSSION

### I. *Standard of Review*

"Code of Civil Procedure section 1094.5 provides a trial court reviewing the decision of an administrative agency exercises its independent judgment in reviewing the evidence and that an 'abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence.' (Code Civ. Proc., § 1094.5, subd. (c).) Under the independent review standard, the trial court may weigh the credibility of witnesses." (*San Diego Unified School Dist. v. Commission on Professional Competence* (2011) 194 Cal.App.4th 1454, 1461 [124 Cal.Rptr.3d 320].)

Though the trial court is required to exercise its independent judgment on the evidence, it is to give a "strong presumption of correctness" to the Commission's findings. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817 [85 Cal.Rptr.2d 696, 977 P.2d 693] (*Fukuda*); see *City of Pleasanton v. Board of Administration* (2012) 211 Cal.App.4th 522, 536 [149 Cal.Rptr.3d 729] (*City of Pleasanton*); *Breslin v. City and County of San Francisco* (2007) 146 Cal.App.4th 1064, 1077–1078 [55 Cal.Rptr.3d 14].) In a proceeding on a writ of administrative mandate, "the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." (*Fukuda*, at p. 817; see *Breslin*, at

p. 1077 ["In the trial court, the [petitioners] had the burden of proof to show that the [agency's] decision was not supported by the weight of the evidence—that is, that the decision was not supported by the preponderance of the evidence."].) Independent judgment review " 'does not mean that the preliminary work performed by the administrative board in sifting the evidence and in making its findings is wasted effort. . . . [I]n weighing the evidence the courts can and should be assisted by the findings of the board.' " (*Fukuda*, at p. 812; see *Mason v. Office of Admin. Hearings* (2001) 89 Cal.App.4th 1119, 1130 [108 Cal.Rptr.2d 102].)

In *Fukuda*, the California Supreme Court explained: " 'The findings of a board where formal hearings are held should and do come before the courts with a strong presumption in their favor based primarily on the [rebuttable] presumption contained in section 1963, subsection 15, of the Code of Civil Procedure [currently Evidence Code section 664] "[t]hat official duty has been regularly performed." Obviously, considerable weight should be given to the findings of experienced administrative bodies made after a full and formal hearing . . . .' " (*Fukuda, supra,* 20 Cal.4th at p. 812; see *Mason v. Office of Admin. Hearings, supra,* 89 Cal.App.4th at p. 1130.) Such a procedure " 'gives the reviewing court the power and duty of exercising an independent judgment as to both facts and law, but contemplates that . . . the burden shall rest upon the petitioner to support his challenge affirmatively, competently, and convincingly. In .other words, rarely, if ever, will a board determination be disturbed unless the petitioner is able to show a jurisdictional excess, a serious error of law, or an abuse of discretion on the facts.' " (*Fukuda*, at p. 814; see *Mason*, at p. 1131.)

The strong presumption of correctness, however, is not the same as a substantial evidence review and does not relieve the trial court of its obligation to make its own findings. "[T]he presumption provides the trial court with a starting point for review—but it is only a presumption, and may be overcome. Because the trial court ultimately must exercise its own independent judgment, that court is free to substitute its own findings after first giving due respect to the agency's findings. . . . [T]here is no inconsistency in a rule requiring that a trial court begin its review with a presumption of the correctness of administrative findings, and then, after affording the respect due to these findings, exercise independent judgment in making its own findings." (*Fukuda, supra,* 20 Cal.4th at pp. 818–819.)

" 'After the superior court makes an independent judgment upon the record of an administrative proceeding, [the] scope of review on appeal is limited.' [Citation.] We must sustain the trial court's findings if they are supported by substantial evidence. [Citation.] In reviewing the evidence, we resolve all conflicts in favor of the party prevailing at the trial court level and must give

that party the benefit of every reasonable inference in support of the judgment. ' " " 'When more than one inference can be reasonably deduced from the facts, the appellate court cannot substitute its deductions for those of the superior court.' " ' " (*San Diego Unified School Dist. v. Commission on Professional Competence, supra,* 194 Cal.App.4th at p. 1461; *Broney v. California Com. on Teacher Credentialing* (2010) 184 Cal.App.4th 462, 472 [108 Cal.Rptr.3d 832] [after a trial court has exercised its independent judgment on the weight of the evidence, an appellate court's function is solely to decide whether credible, competent evidence supports the trial court's judgment]; see *California Teachers Assn. v. Governing Board* (1983) 144 Cal.App.3d 27, 37 [192 Cal.Rptr. 358].) "Substantial evidence" is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. (*Hosford v. State Personnel Bd.* (1977) 74 Cal.App.3d 302, 307 [141 Cal.Rptr. 354].) It is sufficient " 'if any reasonable trier of fact could have considered it reasonable, credible and of solid value.' " (*Kazensky v. City of Merced* (1998) 65 Cal.App.4th 44, 52 [76 Cal.Rptr.2d 356].)

"If there is substantial evidence, the judgment must be affirmed. [Citation.] We do not reweigh the evidence. Our inquiry 'begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact.' " (*San Diego Unified School Dist. v. Commission on Professional Competence, supra,* 194 Cal.App.4th at pp. 1461–1462.)

## II. *Evident Unfitness to Teach—Legal Standards*

In our view, the pertinent inquiry is not only whether substantial evidence supports the trial court's findings as to Emily's credibility and account of Jesperson's touching, but also whether substantial evidence supports its conclusion—reached only after the parties had convinced it remand to the Commission was not necessary—that Jesperson's touching constitutes "immoral conduct making him unfit to teach."

█ Though a claim of "[i]mmoral or unprofessional conduct" is an independent ground for dismissal (Ed. Code, § 44932, subd. (a)(1)), "the determinative test [is] fitness to teach; the terms 'immoral' or 'unprofessional conduct' are so broad and vague that, standing alone, they could be constitutionally infirm; hence the proper criteria is fitness to teach. . . . [T]he board cannot 'abstractly characterize the conduct . . . as "immoral," "unprofessional," or "involving moral turpitude" within the meaning of [Education Code] section 13202 . . . unless that conduct indicates that petitioner is unfit to teach.' " (*Board of Education v. Jack M.* (1977) 19 Cal.3d 691, 696–697 [139 Cal.Rptr. 700, 566 P.2d 602], citation omitted.) Fitness to teach is a

question of ultimate fact. (*Id.* at p. 698, fn. 3; *West Valley-Mission Community College Dist. v. Concepcion* (1993) 16 Cal.App.4th 1766, 1775 [21 Cal.Rptr.2d 5].)

■ "In the context of a teacher, ' "evident unfitness for service" . . . means "clearly not fit, not adapted to or unsuitable for teaching, ordinarily by reason of temperamental defects or inadequacies." Unlike "unprofessional conduct," "evident unfitness for service" connotes a fixed character trait, presumably not remediable merely on receipt of notice that one's conduct fails to meet the expectation of the employing school district.' " (*San Diego Unified School Dist. v. Commission on Professional Competence, supra*, 194 Cal.App.4th at p. 1462; see *Woodland Joint Unified School Dist. v. Commission on Professional Competence* (1992) 2 Cal.App.4th 1429, 1444 [4 Cal.Rptr.2d 227].)

■ In *Morrison*, the California Supreme Court provided a number of factors relevant to determining unfitness to teach: "[T]he [factfinder] may consider such matters as the likelihood that the conduct may have adversely affected students or fellow teachers, the degree of such adversity anticipated, the proximity or remoteness in time of the conduct, the type of teaching certificate held by the party involved, the extenuating or aggravating circumstances, if any, surrounding the conduct, the praiseworthiness or blameworthiness of the motives resulting in the conduct, the likelihood of the recurrence of the questioned conduct, and the extent to which disciplinary action may inflict an adverse impact or chilling effect upon the constitutional rights of the teacher involved or other teachers." (*Morrison v. State Board of Education, supra*, 1 Cal.3d at p. 229, fns. omitted (*Morrison*).) " 'These factors are relevant to the extent that they assist the board in determining whether the teacher's fitness to teach, i.e., in determining whether the teacher's future classroom performance and overall impact on his students are likely to meet the [school district's] standards.' " (*San Diego Unified School Dist. v. Commission on Professional Competence, supra*, 194 Cal.App.4th at p. 1462.)

■ "To establish a teacher is unfit to teach, *Morrison* requires a nexus between government employment and alleged employee misconduct stemming from the principle that '[n]o person can be denied government employment because of factors unconnected with the responsibilities of that employment.' " (*San Diego Unified School Dist. v. Commission on Professional Competence, supra*, 194 Cal.App.4th at p. 1463.)

### III. *Contentions*

Jesperson contends that the superior court's finding that he touched Emily "in the manner to which she testified" is not supported by substantial

evidence. He maintains that the differing accounts of Emily's testimony as to what happened, how frequently, and when or where the conduct occurred, varied to such an extent that the court's finding is "vague, conflicting and not supportive of the administrative dismissal charges." He argues the "snippets of evidence" cited by the court suggest it did not appreciate or fairly consider the breadth of the evidence supporting the Commission's unanimous decision. According to Jesperson, the trial court's finding that he touched Emily is based on highly improbable evidence and ignored substantial contrary evidence. He points to the fact that the purported touching occurred in a classroom filled with students and in the presence of another adult, Murphy, who watched the entire room; the fact the touching was purported to take place at an open table in plain sight from every location in the classroom; the difficulty with which Jesperson could touch a student standing on his right while he corrected papers with his right hand; the absence of any corroborating witnesses to Emily's account; the corroboration of Jesperson's testimony by Murphy's testimony that she never saw him touch Emily in the manner Emily described; Murphy's report to Detective Newbold that she had never seen him touch another student inappropriately; and the improbability of Emily's testimony that the touching occurred every day.

Jesperson further contends the trial court did not afford a strong presumption of correctness to the Commission's decision and its credibility determinations. He argues the trial court's statements and decision were made without regard to the numerous sources of Emily's testimony and other evidence that raised concerns about her credibility. Jesperson points out that because the Commission identified specific evidence of the observed demeanor and manner of the witnesses in assessing their credibility, the trial court was required to give "great weight" to the Commission's determination under Government Code section 11425.50, subdivision (b), but did not, as evidenced by the isolated references offered to support its conclusions and its consideration of only Emily's 2010 administrative hearing testimony. Jesperson points out the trial court made no reference to his own background and testimony. Jesperson argues that the court's disregard of the strong presumption is apparent by the fact the Commission's findings were so "immediately rebutted by the trial judge's own 'gut instinct' about what happened."

Jesperson finally contends that the trial court abused its authority by reversing the Commission's decision without making findings applying the requisite legal criteria under *Morrison, supra*, 1 Cal.3d 214 (also appearing at Cal. Code Regs., tit. 5, § 80302).

### IV. *The Evidence Does Not Show the Commission's Findings Are Contrary to the Weight of the Evidence*

In keeping with the above summarized review standards, the superior court was to hold District to its burden to convince it that the Commission's administrative findings were contrary to the weight of the evidence. (*Fukuda, supra,* 20 Cal.4th at p. 817.) This court's task on appeal is "to review the record and determine whether the *trial court's* findings (not the administrative agency findings) are supported by substantial evidence." (*Candari v. Los Angeles Unified School Dist.* (2011) 193 Cal.App.4th 402, 407–408 [122 Cal.Rptr.3d 53].) Under the sufficiency of the evidence standard, Jesperson's burden on appeal is heavy. (*California Teachers Assn. v. Governing Board, supra,* 144 Cal.App.3d at p. 37; *Perez v. Commission on Professional Competence* (1983) 149 Cal.App.3d 1167, 1176 [197 Cal.Rptr. 390].)

Nevertheless, we conclude there is merit to Jesperson's challenge, requiring reversal of the judgment. Our conclusions, more fully explained below, stem from infirmities in the trial court's treatment of the presumptions and weight applicable to the Commission's findings and decision, as well as the state of the evidence.

### A. *The Trial Court Used an Erroneous Premise to Rebut the Presumption of Correctness*

In its ruling on District's writ petition, the trial court began with the perception that the Commission was inaccurate in reciting some evidentiary facts; it found some of the Commission's key findings were contradicted by the administrative hearing transcript. The court's observations, however, did not account for all of the evidence before the Commission.

Specifically, the court suggested the Commission was incorrect when it found Emily had "stated that the inappropriate touching occurred while other students were in class and standing nearby." Contrary to that observation, however, Emily consistently recounted that the touching occurred during regular class time with other students in class. And, toward the end of Emily's trial testimony on recross-examination, Emily agreed there were times that other students were waiting in line for their papers to be corrected when she went to Jesperson's desk.[6] In this respect, the Commission was not factually inaccurate in its findings about Emily's statements.

---

[6] At the administrative hearing, the following testimony was read into the record from Jesperson's criminal trial: " 'Question: Emily, when you went back to the desk, was there a—sometimes a line of students that would be waiting for their—[¶] Answer: Yes. [¶] Question:—papers to get corrected too? [¶] Answer: Yes. [¶] Question: So while you were getting your paper corrected, there would be some students waiting to get their paper corrected too? [¶] Answer: Sometimes.' "

The trial court then suggested the Commission was incorrect in its conclusion that Emily stated the touching had occurred every day. The court's conclusion, however, disregards Emily's children's hospital interview in the administrative record, during which she did in fact tell Lainez that the touching happened "every day" starting a week after school began. Emily also testified at the first criminal trial that Jesperson's touching occurred "[a]lmost every day." At the administrative hearing, Emily was asked whether the touching happened "once, often, or more than once." She replied: "I don't remember how many times, but it happened more than like a few times." Again, the Commission was not incorrect in its findings as to Emily's account of Jesperson's touching. It was entitled to rely on all of Emily's accounts in the evidence before it, including Emily's interview statements and criminal trial testimony, to assess her credibility before and during the administrative hearing. And the superior court was required to assess and weigh *all* of the relevant evidence in the administrative record, not just the evidence that supported Emily's accounts. (See, e.g., *Cate v. State Personnel Bd.* (2012) 204 Cal.App.4th 270, 281 [138 Cal.Rptr.3d 691] [trial court reviewing agency's decision for substantial evidence is to consider " ' " 'all relevant evidence in the administrative record including evidence that fairly detracts from the evidence supporting the agency's decision' " ' " and in doing so its "task necessarily 'involves some weighing of the evidence to fairly estimate its worth' "].)

In short, contrary to the trial court's conclusion, the Commission was not factually inaccurate in its underlying conclusions that went to the plausibility of Emily's administrative hearing testimony. The trial court's threshold perception about the Commission's accuracy about the evidence before it was flawed, and that misconception tainted its view of the Commission's findings, affecting the requirement that it grant a strong presumption of correctness to the administrative findings and proceed on the basis that it was District's burden to convince the court the administrative findings were contrary to the weight of the evidence. (See *City of Pleasanton, supra*, 211 Cal.App.4th at p. 536.) Though at the outset the superior court correctly observed it was to afford a strong presumption of correctness to the Commission's findings, it is apparent the court used these perceived inaccuracies concerning the administrative record to overcome or rebut that presumption and reject the Commission's decision. And, in our view, the trial court's erroneous threshold determination colored its remaining findings such that it did not give due respect to the Commission's assessment of the weight of the evidence.

B. *The Trial Court Did Not Give Sufficient Weight to the Commission's Credibility Determinations*

Nor did the trial court give "great weight" to the Commission's credibility determinations, as it was required to do under the Administrative Procedure

Act (APA; Gov. Code, § 11340 et seq.). (*Fukuda, supra,* 20 Cal.4th at p. 819; Ed. Code, § 44944 [applying APA to hearing concerning suspension or dismissal of permanent employee by school district]; Gov. Code, §§ 11500, 11501 [applying administrative adjudicative provisions, including written decision requirements of Gov. Code, § 11425.50 to adjudicative proceedings required to be conducted under APA]; see *Basurto v. Imperial Irrigation Dist.* (2012) 211 Cal.App.4th 866, 882 [150 Cal.Rptr.3d 145] [acknowledging application of APA to school districts by statute].)

██ An agency decision as to witness credibility has certain requirements under the APA, specifically, Government Code section 11425.50. "If the factual basis for [an administrative agency's] decision includes a determination based substantially on the credibility of a witness, the statement shall identify any specific evidence of the observed demeanor, manner, or attitude of the witness that supports the determination, and on judicial review the court shall give great weight to the determination to the extent the determination identifies the observed demeanor, manner, or attitude of the witness that supports it." (Gov. Code, § 11425.50, subd. (b); *Kifle-Thompson v. State Bd. of Chiropractic Examiners* (2012) 208 Cal.App.4th 518, 534, fn. 8 [145 Cal.Rptr.3d 627]; *Cate v. State Personnel Bd., supra,* 204 Cal.App.4th at pp. 281–282.) The Law Revision Commission Comments state that Government Code section 11425.50, subdivision (b) " 'require[s] that the reviewing court weigh more heavily findings by the trier of fact (the presiding officer in an administrative adjudication) based on observation of witnesses than findings based on other evidence. . . . [¶] . . . However, the presiding officer's identification of such findings is not binding on the agency or the courts, which may make their own determinations whether a particular finding is based substantially on credibility of a witness. Even though the presiding officer's determination is based substantially on credibility of a witness, the determination is entitled to great weight only to the extent the determination derives from the presiding officer's observation of the demeanor, manner, or attitude of the witness.' " (*Cate,* at p. 282; see *California Youth Authority v. State Personnel Bd.* (2002) 104 Cal.App.4th 575, 595–596 [128 Cal.Rptr.2d 514].)

Here, the Commission afforded little credibility to Emily's and Emeilia's testimony, and gave credence to Murphy's, in part after identifying aspects of their "observed demeanor, manner, or attitude." (Gov. Code, § 11425.50, subd. (b).) It explained that Emily's demeanor in describing the touching was "without significant emotion" and Emeilia's demeanor suggested some "over-dramatiz[ation]." The Commission viewed these concerns collectively with other facts in the record that negatively impacted the reliability of Emily's testimony, including the differences in her various accounts as to the circumstances under which she informed her mother of the touching, the implausibility of the described inappropriate touching occurring every day in a

populated classroom, the fact Murphy was present daily in Jesperson's classroom without observing anything inappropriate, the absence of witnesses or corroboration, Emeilia's failure to call police, the influence of a subsequent civil lawsuit against District, and other facts detailed in its decision.

On the other hand, the Commission found Murphy "very credible" in that her testimony was "relaxed," she admitted when she could not recall details, and she seemed to be answering in a "direct and truthful manner to the best of her recollection." These recitations are sufficient to comply with the requirements of an agency decision under the APA. (Accord, *Kifle-Thompson v. State Bd. of Chiropractic Examiners, supra*, 208 Cal.App.4th at p. 534 & fn. 8 [board's reference to " 'aggravating evidence' " to determine disciplinary action, namely, that petitioner's conduct during an administrative hearing "indicated a 'lack of candor, insight and honesty,' " and her " 'repeated[]' inability to recall 'significant events' " was in compliance with the requirements of Gov. Code, § 11425.50, subd. (b)].)

 Though the Commission's credibility determinations were reached after a careful and considered examination of the administrative record, the superior court rejected them without meaningfully assessing the Commission's reasons for reaching them. Instead, the judge gave little weight or deference to the Commission's determinations, and made his own conclusion about Emily's credibility based not on a full consideration or weighing of the record evidence, but on the isolated facts of her age and the "nature of the incidents," as well as his personal experience as a juvenile court judge.

We recognize that the trial court is entitled to substitute its own credibility determinations (*Fukuda, supra*, 20 Cal.4th at p. 818; *Governing Board v. Haar* (1994) 28 Cal.App.4th 369, 377, 381 [33 Cal.Rptr.2d 744]), but it cannot ignore its statutory obligation to defer to the Commission's considered credibility findings in doing so. In our view, the superior court's decision—which is silent as to the Commission's thoughtful reasoning and analysis as to the witnesses' credibility—did not afford the respect due those findings.

C. *The Trial Court Did Not Base Its Decision on All of the Administrative Record Evidence*

The trial court was required to examine the administrative record for errors of law and exercise its independent judgment "upon the weight of the evidence produced . . . ." (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 143, fn. 10 [93 Cal.Rptr. 234, 481 P.2d 242] [trial court exercises independent judgment on the weight of the administrative record evidence, evidence that could not, in the exercise of reasonable diligence, have been produced before the administrative agency, and any evidence which might have been improperly excluded

by the administrative agency]; *SP Star Enterprises, Inc. v. City of Los Angeles* (2009) 173 Cal.App.4th 459, 469 [93 Cal.Rptr.3d 152].)

■ However, it is plain from the foregoing discussion that the court had not considered Emily's Children's Hospital interview in which she reported to Lainez that Jesperson touched her under her clothing every day. There is a vast amount of other record evidence calling into question the reliability of Emily's and Emeilia's testimony that the trial court did not discuss or reconcile. In view of the court's limited ruling, we cannot reasonably infer it examined all of the evidence in the administrative record. A trial court's failure to consider all of the evidence in these circumstances can be a component of error that warrants reversal. (See *San Dieguito Union High School Dist. v. Commission on Professional Competence* (1982) 135 Cal.App.3d 278 [185 Cal.Rptr. 203].)[7]

D. *Any Factual Finding That Jesperson Is Unfit to Teach Is Not Supported by the Weight of the Evidence or Substantial, Credible Evidence That His Touching of Emily Was Inappropriate or Immoral*

Finally, we conclude that the administrative record evidence does not contain substantial evidence supporting factual findings of Jesperson's immoral conduct, "[e]vident unfitness for service," or persistent violation of laws. (Ed. Code, § 44932, subd. (a)(1), (5) & (7).)

■ The evidence must not only be sufficient to support a finding that Jesperson engaged in misconduct, but also a finding that his misconduct met the criteria for unfitness for service as articulated in *Morrison, supra*, 1 Cal.3d 214 and was derived from a temperamental defect that made his unfitness evident. (*San Diego Unified School Dist. v. Commission on Professional Competence, supra*, 194 Cal.App.4th at p. 1462; *Woodland Joint Unified School Dist. v. Commission on Professional Competence, supra*, 2 Cal.App.4th at p. 1445.) To demonstrate unfitness for service, the evidence must establish Jesperson's conduct adversely affected students or fellow teachers to a

---

[7] In *San Dieguito Union High School Dist. v. Commission on Professional Competence, supra*, 135 Cal.App.3d 278, we remanded the matter for further proceedings to allow the trial court to consider all of the record evidence and establish a factual nexus between the teacher's misconduct (repeated absences) and unfitness to teach, as well as establish whether the teacher there accused of absences had engaged in a " 'persistent violation . . . of school rules' " within the meaning of the Education Code. (*San Dieguito Union High School Dist.*, at pp. 288–289.) Here, because we conclude the administrative record does not support a finding that Jesperson engaged in conduct constituting unfitness to teach, remand is not necessary.

significant degree, and had a great likelihood of recurrence. (*Morrison*, at p. 235.) There must be a "factual nexus between [the teacher's misconduct] and unfitness to teach." (*San Dieguito Union High School Dist. v. Commission on Professional Competence, supra*, 135 Cal.App.3d at p. 288.) Again, it was District's burden to " 'convince the court that the [Commission's] decision [was] contrary to the weight of the evidence.' " (*Fukuda, supra*, 20 Cal.4th at p. 812, italics omitted.) That is, District was required to prove by a "preponderance of evidence" that Jesperson was evidently unfit for service. (*Id.* at p. 810.)

The superior court's factual finding of immoral touching based on Emily's account suffers from a fatal absence of detail. The court ruled the administrative evidence supported Emily's testimony—that Jesperson's touching was "in the manner to which she testified"—without describing the type or nature of touching that assertedly occurred. There is unquestionably evidence (including Jesperson's and Murphy's testimony) to support a conclusion that Jesperson touched Emily and other students while he was correcting their work. However, as we explain, there is no substantial, credible, or reliable evidence to support a finding that the touching was so offensive, inappropriate or immoral that it rendered him unfit to teach.

The accounts of the circumstances of Emily's first report of the touching are neither detailed nor consistent. Emily admitted she had denied being touched the first time she was interviewed. According to Emeilia, in Emily's first report of the conduct Emily talked about it without concern, telling her mother Jesperson was just being "playful" and did the same thing with other students. Emily's report to her mother was consistent with her statement to the children's hospital interviewer Lainez, that Jesperson always said, "You did a good job," when he touched her. Though Emily admitted she did not initially think Jesperson's touching was "bad" and only learned it was so when she spoke with Detective Newbold, she inconsistently testified at the criminal trial (and averred in her Sept. 2009 declaration) that she had waited to tell her mother because she thought her mother would be angry. At the administrative hearing, Emily testified she first told her mother after principal Davis sent a letter home about Jesperson. At the hearing, Emily was only able to recount what her mother told her she had said at the time.

Emily also claimed to Lainez that she was touched under her clothing, every day, including over her underwear on her buttocks. At the criminal trial, she described it as Jesperson sticking his hand inside her pants

between her legs, over her underwear. It is highly improbable that such inappropriate touching could occur on a daily basis for a period of weeks without someone, including Murphy, noticing, given the layout of Jesperson's classroom and the presence at times of other students waiting in line behind Emily. Likewise, we consider it highly improbable, if not physically impossible, that Emily could not recall feeling any skin-to-skin contact if the touching had occurred daily or almost daily for up to "a minute maybe." Emily admitted she never felt the need to move away from Jesperson and denied that his touching felt "weird." District presented no evidence that other students were inappropriately touched, or felt uncomfortable around Jesperson. Testimony is properly discarded on a sufficiency of evidence analysis when it is inherently improbable or improbable on its face, that is, when it seeks to show " 'that something has occurred that it does not seem possible could have occurred under the circumstances disclosed.' " (*People v. Mayberry* (1975) 15 Cal.3d 143, 150 [125 Cal.Rptr. 745, 542 P.2d 1337]; see *People v. Fontana* (2010) 49 Cal.4th 351, 369 [111 Cal.Rptr.3d 1, 232 P.3d 1187]; see generally *People v. Ennis* (2010) 190 Cal.App.4th 721, 729 [118 Cal.Rptr.3d 270].)

In its brief, District characterizes Jesperson's touching as "gross molestation," sexual misconduct motivated by sexual interest, or "sexual harassment." It misleadingly asserts at the outset of its briefing that Jesperson "was tried and convicted three times of lewd acts against a child under the age of fourteen."[8] District purports to recount Emeilia as testifying that Jesperson "would grab and squeeze [Emily's] upper thigh with his thumb in the front and fingers in the back." But Emeilia did not so testify. She testified at the administrative hearing that Emily was touched on the "leg," and at Jesperson's first criminal trial that Emily was touched on the "leg and back." As described by the hearing officer at the administrative hearing, the record indicates Jesperson touched Emily on the side of her right leg with his thumb pressed on the "front part" of her hip. Neither Emily nor Emeilia described it as grabbing or squeezing. District's characterization is not supported by the record.

Finally, the trial court's conclusion of unfitness was required to be based upon an objective standard such as that articulated in *Morrison*. "The *Morrison* standard gives substance to the tenured teacher's right to be discharged only for cause. If the *Morrison* standards are not applied, the

---

[8] Though we recognize District purports to recount historical facts, as it stands today, Jesperson is not a convicted felon; he does not stand convicted of any lewd conduct offense against Emily or any other student.

teacher is left essentially at the mercy of the Board (or the trial court) to be discharged whenever cause exists in the subjective estimation of either body. Such a procedure would make a shambles out of the tenure and job security now enjoyed by teaching employees." (*San Dieguito Union High School Dist. v. Commission on Professional Competence, supra*, 135 Cal.App.3d at p. 288.)

The trial court stated it had considered the record "in light of the *Morrison* factors" but made no express findings as to them. Though we are required to imply such findings, we cannot when they are not supported by substantial evidence. We cannot say the nature of Jesperson's touching presents an "extenuating or aggravating circumstance[]."[9] (*Morrison, supra*, 1 Cal.3d at p. 229.) The Commission observed that Emily was without significant emotion when she testified, and Emily admitted she did not have an adverse reaction to any sort of touching, but only came to believe Jesperson's conduct was "bad" after being told it was so. There is no evidence of substantial notoriety in the record, but even assuming some notoriety, no evidence was presented that it impaired any of Jesperson's on-campus relationships. Indeed, Murphy and Davis looked favorably upon Jesperson's teaching performance. (Cf. *San Diego Unified School Dist. v. Commission on Professional Competence, supra*, 194 Cal.App.4th at p. 1463 ["A teacher may be discharged where his conduct 'has gained sufficient notoriety so as to impair his on-campus relationships.' "; the principal in that case testified that she had "lost confidence" in the teacher's ability to serve as a role model for students, and that constituted substantial evidence of an adverse impact on the teacher's on-campus relationships].)

There was no testimony about Jesperson's alleged conduct having an adverse effect on any fellow teachers, Jesperson's classroom performance, or his overall ability to teach. There was no criticism in the record of his performance as a teacher from his peers, nor any suggestion that his conduct outside the classroom was other than beyond reproach. (Accord, *Morrison*, 1 Cal.3d at p. 218.) As in *Morrison*, District called no medical; psychological or psychiatric experts to testify.

For all the foregoing reasons, we reverse the judgment.

---

[9] District argues otherwise, suggesting that Jesperson's touching by itself constitutes an aggravating or extenuating circumstance because it is "immoral conduct involv[ing] sexual harassment of a student of a physical nature . . . ." In our view, District's assertion is the sort of abstract characterization of Jesperson's conduct disapproved in *Morrison, supra*, 1 Cal.3d at page 229 (see *Board of Education v. Jack M., supra*, 19 Cal.3d at pp. 696–697). District was required to show the conduct in question indicates an unfitness to engage in the profession. (*Watson v. Superior Court* (2009) 176 Cal.App.4th 1407, 1416 [98 Cal.Rptr.3d 715].)

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court with directions to enter a new judgment denying the petition for writ of mandate. Jesperson shall recover his costs.

Aaron, J., and Irion, J., concurred.

The petition of respondent San Diego Unified School District for review by the Supreme Court was denied July 17, 2013, S210406. Corrigan, J., was of the opinion that the petition should be granted.