Filed 7/28/14  Fulkes v. Bd. of Retirement of Tulare County Employees Retirement Assn. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| RUSSELL FULKES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>BOARD OF RETIREMENT OF TULARE COUNTY EMPLOYEES' RETIREMENT ASSOCIATION,<br><br>Defendant and Appellant. | F067677<br><br>(Super. Ct. No. VCU241641)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Paul A. Vortmann, Judge.

Kathleen Bales-Lange, County Counsel, and Judy Chapman, Deputy County Counsel, for Defendant and Appellant.

Thomas J. Tusan for Plaintiff and Respondent.

-ooOoo-

The Board of Retirement of Tulare County Employees' Retirement Association (the Board) hereby appeals from the judgment of the trial court granting a petition for writ of mandate in favor of Tulare County employee Russell Fulkes. The trial court reviewed the administrative record and ordered the Board to classify Fulkes's disability as a *service-connected* disability, which was a reversal of the Board's findings on that issue. In its appeal, the Board challenges the trial court's ruling on the grounds that it allegedly applied the wrong standard and failed to adequately consider all the evidence. We disagree. On the record before us, we conclude that the trial court applied the correct standard of review and that its ruling was supported by substantial evidence. Accordingly, we affirm the judgment below.

## FACTS AND PROCEDURAL HISTORY

In the proceedings below, the Board did not deny that Fulkes had become permanently disabled to carry out his job duties and it granted Fulkes a non-service-connected disability retirement. The crux of the dispute between the parties was whether that permanent disability was, in fact, service-connected. According to the relevant statutory provision, a county employee qualifies for a service-connected disability if, and only if, "[t]he member's incapacity is a result of injury or disease arising out of and in the course of the member's employment, and such employment contributes substantially to such incapacity ...." (Gov. Code, § 31720, subd. (a).)[1] The main focus of the evidence and argument below was the particular issue whether Fulkes's employment *contributed substantially* to his permanent disability. With that brief introduction, we now summarize the factual record and procedural matters leading to the present appeal.

Fulkes's Testimony

We begin with a synopsis of Fulkes's testimony in the administrative hearing before a hearing officer appointed by the Board. Again, the purpose of the administrative

---

[1]     Unless otherwise indicated, statutory references are to the Government Code.

2.

hearing was to determine whether Fulkes's permanent disability was service-connected, as claimed by Fulkes.

Fulkes was employed as a criminal investigator for the Tulare County District Attorney's Office (a DA criminal investigator).  A DA criminal investigator is a peace officer, and thus Fulkes carried a gun and underwent periodic firearms training as part of his job. Depending on his particular area of assignment, his duties included investigating welfare fraud and workers' compensation fraud, assisting family support services, locating and interviewing witnesses and criminal suspects, collecting evidence, and serving search warrants and arrest warrants.  Fulkes worked in this capacity from July 28, 2001, until July 21, 2008, and during that time consistently received satisfactory performance evaluations.  The last day that Fulkes was physically on the job was July 21, 2008.  As explained more fully below, he claimed that a psychiatric disability (i.e., an exacerbation of posttraumatic stress disorder (PTSD) due to events on the job) caused him to be unable to continue his job responsibilities thereafter.

Fulkes also served in the military.  Before he began working for Tulare County, he had been on active military duty with the Marine Corps.  In 2004, during his career with Tulare County as a DA criminal investigator, Fulkes joined the Navy Reserves.  On two separate occasions during his employment with the Tulare County, Fulkes was activated by the Navy and deployed to Iraq for military service.  The first tour of duty was a period of approximately 11 months, from November 2005 to October 2006.  The second was a period of approximately six months, from April 2007 to August or September 2007.

Sometime before going to Iraq, Fulkes went through military training exercises about how to clear buildings in "close quarters battle" situations, which would involve a small squad going through individual structures or houses with simulated hostile targets appearing.  He also did some additional "clearing exercises" while he was serving in Iraq.

On his first tour of duty in Iraq, Fulkes provided security at a prison setting that was a compound for the detention of detainees.  The detainees consisted of persons who

participated in attacks against coalition forces. Fulkes worked an entry control point where vehicles entered and exited the facility, which vehicles had to be carefully inspected. Additionally, he was involved in a construction detail at a forward operating base. He participated in at least three convoys that transported prisoners to an airport, serving as gunner on the lead vehicle. Fulkes's first tour of duty was in Northern Iraq, but his second tour was based in Southern Iraq, which was considered to be a more dangerous region. During his second tour, he provided security and assisted with construction, as before. The purpose of the construction was to build additional compounds to hold detainees. During the second tour, Fulkes was aware of a military person on base who was stabbed in the neck by one of the detainees. However, Fulkes was not exposed to any improvised explosive devices or similar explosions during his military service in Iraq. He occasionally heard gunfire, but he did not personally know of anyone injured by gunfire or bombs. He was aware from news reports that other military bases had sometimes come under attack.

While deployed in Iraq, Fulkes was on a temporary leave of absence from his employment with Tulare County. Upon Fulkes's return from each deployment, he immediately resumed his usual job duties as a DA criminal investigator for Tulare County. He did not have any difficulty performing his job duties when he returned from either of the two tours in Iraq. His last formal performance evaluation was for the period of October 28, 2007, through February 3, 2008, and that evaluation reflected his job performance was satisfactory.

Fulkes testified that he was able to perform his job responsibilities until two significant events occurred while he was on duty. The first such event was in June or July 2008 at the firing range, where an exercise was being conducted as part of his training as a DA criminal investigator/peace officer. Fulkes was participating, with guns drawn, in a scenario where he was part of a three- to four-man team of first responders seeking to clear a simulated school building and to find and eliminate the "active shooter"

4.

in the simulated school environment. As part of the exercise, the participants walked through the staging area and fired their weapons at certain hostile targets (designed to look like they had guns), but avoided shooting the nonthreatening targets that also appeared. After the exercise, the range master criticized Fulkes and the other participants, telling them they conducted the exercise incorrectly. Fulkes immediately became extremely angry at the range master and a heated argument ensued between them. Fulkes had been in charge of the team and believed the exercise was done appropriately. This heated argument with the range master left Fulkes feeling upset, angry and disappointed, and he stewed about what had happened for a couple of weeks. He was bothered with the thought that the things the range master said could possibly put him and his coworkers in danger, but he also worried that the firing range episode was affecting him too much, and too intensely. After these events at the firing range, Fulkes experienced difficulty sleeping and he reported the sleep problem to his supervisor.

The second significant event was on or about July 21, 2008, when a tire blew out on the Tulare County vehicle that Fulkes was driving on his way home from work. For certain reasons relating to the nature of his work, Fulkes considered this trip home to have occurred while he was still "on duty" or still on the job, and the Board agreed with that assessment. Thus, there is no dispute that this was a work-related event. Fulkes heard the sound of the tire blowing out and felt the car jerk, so he quickly pulled over to the shoulder of the highway. Fulkes testified that once the car was pulled over, he just sat there and panicked, doing nothing. He felt unable to get out of the car. He did not feel safe, which was a very unusual reaction for him to have. His heart was racing very fast. He testified that what he felt went beyond a normal apprehension regarding traffic. He felt something more—a fear of someone attacking him or hurting him. Eventually, after 10 or 15 minutes of panic, he was able to calm down, get out of the car and change the tire. After this incident, he was stressed out and unable to sleep that night. He continued

5.

to be very anxious for several days, and he decided to seek attention at the Veterans Administration Hospital (VA).

Fulkes admitted that he was still in the Navy Reserves as of the date of the administrative hearing. His involvement in the Navy Reserves required that he go to the firing range periodically. The last time he had gone to the firing range as a member of the Navy Reserves was about a year prior to the administrative hearing.[2] At the time of his testimony, since he was not "current" on his arms and ammunition qualifications, he could not shoot ranges.

Expert Opinions

*Dr. Kathleen Munsell*

Fulkes's expert was his treating physician, Dr. Kathleen Munsell, a clinical psychologist. Fulkes became one of Dr. Munsell's regular patients in October 2008, which treatment continued through the time of the administrative hearing. In the "TREATING PHYSICIAN'S STATEMENT OF DISABILITY" prepared by Dr. Munsell, which was set forth on a section of Fulkes's application for service-connected disability retirement, Dr. Munsell wrote that Fulkes's PTSD "[was] triggered by conditions similar to Iraq," such as firearm training in warm weather and serving warrants. The report stated that Fulkes was "now permanently disabled for the duties of his occupation." The report specifically required a response to the following question: "[D]id the patient's employment with [Tulare County] contribute substantially to the disabling condition as a real and measurable factor?," to which Dr. Munsell answered, "Yes." In addition to PTSD, Dr. Munsell reported that Fulkes had a secondary preexisting condition of Obsessive Compulsive Personality Disorder (OCD), which also contributed to Fulkes's disability.

---

[2] The administrative hearing was conducted in August 2010.

6.

Dr. Munsell appeared and testified at length at the administrative hearing. She explained that when Fulkes encountered similar conditions on the job to what he encountered in Iraq, such as carrying a gun, being in a prison situation and working in law enforcement, it could "exacerbate" the PTSD that "was already there." She explained that two events—the firing range incident and the tire blowout—had in fact "exacerbated" Fulkes's existing PTSD condition. Prior to these job-related events, Fulkes was able to adequately perform his job duties; afterwards, in her opinion, he was not able to do so. Dr. Munsell testified that in connection with these events, Fulkes had reported flashbacks, difficulty sleeping, intense anger, panic, intense fear, anxiety and other symptoms typical of PTSD. In her opinion, Fulkes's condition was not going to get better and he had become permanently disabled from carrying out his job.

On cross-examination, Dr. Munsell disclosed that one of the main fears that Fulkes reported to her was a fear of terrorists finding him and his family. She believed the original "traumatic" event that likely caused his PTSD to exist was his military service in Iraq in a prison setting among terrorists and the things he experienced or was exposed to in that setting. She did not identify a more specific traumatic event. When asked whether the events on the job with Tulare County caused Fulkes's PTSD to exist, or were a trigger for his symptoms, she said it was the latter. Dr. Munsell conceded that if the events at work had not triggered the symptoms, other occurrences might hypothetically have done so, such as "a blowout on a freeway when he was taking his kids to a baseball game" or "a balloon popping at the mall." However, she thought it was most likely that any triggering event would be something related to law enforcement.

When Dr. Munsell was asked if Fulkes's anger at the range master for criticizing his handling of the firing range training exercise was not more consistent with Fulkes's OCD rather than his PTSD, she replied that was not the case because the disorders are "all tied in together" within the individual and cannot be separated. When asked why Fulkes experienced anger on that occasion rather than fear if his reaction was actually

7.

related to PTSD, she explained that anger is often a "secondary emotion" and that Fulkes may not have been in touch with the fears or the stresses that he was experiencing during that training exercise. She noted further that for most individuals, "[i]t's easier for us to accept it in ourselves that we're feeling anger than it is to accept that we're feeling intense fear."

In response to further questioning about what caused the PTSD, Dr. Munsell reiterated that Fulkes's job-related activities were not the original cause of the PTSD, but they served as a trigger for a reaction based on his PTSD. On redirect examination, Dr. Munsell indicated that Fulkes's permanent disability was "a combination of things" relating to the PTSD, the OCD and the job-related events that occurred in June and July 2008. She confirmed that, in her professional opinion, those job-related events in June and July 2008 "[s]ignificantly contributed" to Fulkes's permanent disability.

*Dr. Michael Barnett*

The expert retained by the Board was Dr. Michael Barnett, a clinical psychiatrist. Dr. Barnett's conclusions were presented at the administrative hearing in the form of two written reports. Dr. Barnett concluded that Fulkes was suffering from a psychological disorder that incapacitated him from being able to perform his job duties. As to what caused the disability, Dr. Barnett's initial written report, dated December 21, 2009, stated the following conclusion: "It is my opinion from reviewing [Fulkes's] history that it was his tours of duty in Iraq that contributed substantially to his disability. He did not mention to me any trauma incurred or experienced as the result of his employment with Tulare County. It is my opinion that he would have the same symptoms regardless of the nature of the county job or any job that he was involved in."

Dr. Barnett's second written report, dated January 14, 2010, was in response to a follow-up question sent to him by email from "Craig Chandler, Retirement Specialist II, Tulare County Employees' Retirement Association," seeking clarification of Dr. Barnett's opinion. In the second report, Dr. Barnett proceeded to reconsider or clarify

the issue of whether Fulkes's employment contributed to the disability. After going back and undertaking a further review of his records, Dr. Barnett made the following significant revision to his earlier opinion: "It is my opinion that [Fulkes] does have a permanent incapacity from performing his job because of his [PTSD]. It is also my opinion that events that occurred during his County employment contributed to this incapacity. Upon further review and consideration, it is my opinion that this contribution was substantial. Although [Fulkes] did not go into specific detail at my [independent medical examination], he did mention that there was significant contributory trauma from his job. Although I do feel the Iraqi tours alone could have caused his symptoms, I do believe there was a significant contribution as well from his job. [¶] … [¶] I hope this clarifies my opinions regarding Mr. Fulkes'[s] disability."

Other Documentary Evidence

Additional documentary evidence was submitted at the administrative hearing, which evidence we briefly note here.

*Fulkes's Disability Application*

Fulkes filed with the Board a written application for disability retirement on August 19, 2009. In his application, Fulkes wrote that his "disability" was a result of "disorders," including PTSD and OCD. He stated he first experienced symptoms in August 2007, but became fully disabled on July 21, 2008. In explaining why he could no longer perform his job functions, Fulkes wrote that due to his current condition, he cannot "respond[] appropriately" to situations of "extremely high risk and stress," such as serving warrants. He stated he had trouble with independent recollection, which hinders his ability to testify in court. Additionally, he reported that "[s]ide effects from the medication make it difficult to function normally throughout the day," including being "disoriented and sleepy." Fulkes's application also explained the impact of his two tours of duty in Iraq and he stated that after returning to work in September 2007, he would "go to bed angry and afraid most nights" and would experience "nightmares" that scared him

9.

"badly." He reported that he would vigilantly check his windows and doors at home to be sure they were locked, and he would check for intruders inside his home. He had "a very difficult time working," but once the tire blowout occurred in which he was paralyzed with fear and anxiety, he went into "a downward spiral" of despair.

As is apparent, several of the statements made by Fulkes in his application were inconsistent with his subsequent testimony at the hearing. At the hearing, he indicated that he was able to perform his job without difficulty until the two job-related events occurred (in June-July 2008) and that he did not experience significant symptoms or difficulty until that time. Whereas, Fulkes's disclosures in the application suggested that some PTSD symptoms were manifesting themselves immediately after he returned from Iraq in 2007.

*Fulkes's Fitness for Duty Evaluation*

After the two job-related events, Fulkes was referred by his supervisor to Dr. J. Stanley Bunce to determine his continued fitness for duty. Symptoms reported to Dr. Bunce included anxiety, anger, hypervigilance, detachment, difficulty concentrating, sleep deprivation, all of which were consistent with PTSD. Additional symptoms such as drowsiness and difficulty processing information appeared to be a result of medications. Dr. Bunce's recommendations were set forth in his letter of July 29, 2008, to Fulkes's supervisor, advising that Fulkes should undergo counseling for PTSD and be reassigned to duties that did not involve carrying a gun or driving.

*Dr. Houghton's Psychological Evaluation and VA Records*

During the course of Dr. Munsell's ongoing treatment of Fulkes, she referred him to be evaluated by another doctor—Dr. Gareth Houghton, a clinical psychologist. Dr. Munsell did so because Dr. Houghton had more experience with OCD and he also had military experience and considerable experience in treating PTSD. Dr. Houghton prepared a written psychological evaluation, dated March 10, 2009. Dr. Houghton's evaluation was that Fulkes was suffering from PTSD and would benefit from further

10.

education and group sessions. His review of Fulkes's past history included a summary of medical charts and records reflecting that Fulkes was experiencing some PTSD symptoms as early as 2006 and 2007, and was also on medications for various psychological and sleep problems in the months preceding the incidents he claims contributed to his disability. Similar information was reflected in some of the entries in the VA medical records.

The Board's Administrative Findings

On November 8, 2010, the hearing officer rendered his decision after the conclusion of the administrative hearing. The hearing officer was unconvinced that Fulkes's employment with Tulare County had anything to do with his disability, noting the following considerations: (i) Fulkes did not identify a specific traumatic event that he experienced in Iraq; (ii) the evidence of Fulkes's "flashbacks" was based solely on his subjective self-reporting to Dr. Munsell; (iii) the firing range incident was, in the hearing officer's opinion, more likely a reaction stemming from Fulkes's OCD, not PTSD; (iv) the flat tire incident merely described what many people would feel when confronted by the stressful situation of having to change a flat tire on the side of the highway; (v) Fulkes's ability to continue to serve in the Navy Reserves was inconsistent with Fulkes's claims; and (vi) no specific data was identified by Dr. Barnett to support the change of opinion stated in his second report.

After a discussion of the evidence, the hearing officer then made the following findings of fact and recommendations regarding the hearing on Fulkes's application for service-connected disability retirement: "The Applicant does not have a disability that arose out of the course of his employment, nor has his employment contributed substantially to a disability within the meaning of … Section 31720." This finding was explained as follows: "The testimony and evidence presented in this matter shows that, to the extent that [Fulkes] is suffering from [PTSD], it was caused by his military service and has not been contributed to in any significant way by his work with Tulare County.

11.

Similarly, to the extent that [Fulkes] is also suffering from [OCD], it was neither caused by, nor contributed to in any significant way, by his work with Tulare County. Speculation to the contrary lacks a sufficient evidentiary foundation and is contradicted by his continued voluntary service as a Master At Arms in the United States Naval Reserves.… [I]t is respectfully recommended that [Fulkes's] Application for a Service Connected Disability Retirement be denied."

On December 8, 2010, the Board met and formally adopted the findings and decision of the hearing officer.

Trial Court's Decision Granting Petition for Writ of Mandate

On March 4, 2011, Fulkes filed a petition for writ of mandate challenging the Board's administrative decision. The administrative record was formally lodged with the trial court by the Board on April 2, 2012. The initial hearing on the writ of mandate was held October 9, 2012, at which time the trial court asked the parties to provide further clarification on the issue of the standard of review. The parties responded by providing supplemental briefing on that issue. In addition, each party filed trial briefs on the merits of the writ petition and appeared for oral argument on April 4, 2013.

On May 8, 2013, the trial court filed and served its "RULING ON SUBMITTED MATTER." In its ruling, the trial court clearly stated the correct standard of review based on the applicable case law. The trial court reviewed the record before it and concluded that Fulkes disability was service-connected, based largely on the opinions of Dr. Munsell and Dr. Barnett to that effect. A judgment granting Fulkes's petition for writ of mandate was issued, which directed the Board to "grant [Fulkes] a service-connected disability retirement." Additionally, Fulkes was awarded his costs and attorney fees.

The Board timely filed the present appeal from the trial court's judgment.

**DISCUSSION**

## I.    County Employee Disability Retirement

The controlling statute regarding the elements needed to establish service-connected disability retirement is section 31720, which states in relevant part as follows: "Any member permanently incapacitated for the performance of duty shall be retired for disability regardless of age if, and only if:  [¶]  (a) The member's incapacity is a result of injury or disease arising out of and in the course of the member's employment, and such employment contributes substantially to such incapacity .…"  Here, since job-related events were the alleged causal factors in Fulkes's disability, the dispositive issue was whether those events in fact "*contribute[d] substantially*" to Fulkes's disability.  (*Ibid*., italics added.)

The statutory phrase "'and such employment contributes substantially to such incapacity'" was added to section 31720 by legislation that took effect in 1981.  (*Bowen v. Board of Retirement* (1986) 42 Cal.3d 572, 574-575 (*Bowen*).)  In *Bowen*, the Board of Retirement argued that the substantial contribution test set forth in the statute required "more than 50 percent industrial causation."  (*Id*. at p. 577.)  The Supreme Court disagreed, holding that the Legislature's intention was to correct a line of appellate cases that had held "even an infinitesimal or inconsequential work-related contribution to disability would suffice for a service-connected disability retirement."  (*Id*. at p. 576.)  The Supreme Court explained that other case law interpreting this statute remained intact, including *DePuy v. Board of Retirement* (1978) 87 Cal.App.3d 392, 398-399 (*DePuy*), which case had accurately stated:  "'[W]hile the causal connection between the [job] stress and the disability may be a small part of the causal factors, it must nevertheless be *real* and *measurable*.  There must be substantial evidence of some connection between the disability and the job.'"  (*Bowen*, *supra*, at p. 578.)  Accordingly, the substantial contribution test set forth in the statute simply required that there be "substantial evidence of a 'real and measurable' connection between the disability and employment."  (*Ibid*.)

13.

The Supreme Court noted further that "this definition of substantial contribution also comports with the principle that pension legislation be applied fairly and broadly." (*Id.* at p. 579.) As we observed in *Valero v. Board of Retirement of Tulare County Employees' Assn.* (2012) 205 Cal.App.4th 960, 964 (*Valero*), the test indicated by the statutory and case authority is this: "a disability applicant's employment must contribute substantially to, or be a real and measurable part of, the employee's permanent disability, in order to qualify the employee for a [service-connected] disability retirement."

    *Lundak v. Board of Retirement* (1983) 142 Cal.App.3d 1040 (*Lundak*) is illustrative. It held that where the causal contribution of the employment to the disability was between 10 percent and 60 percent, which percentages were arrived at by the respective experts, it was sufficient to show that the employment had a "'real and measurable'" contribution to the disability. (*Id.* at p. 1045, following *DePuy*, *supra*, 87 Cal.App.3d at p. 399.) In *Lundak*, the appellate court also noted the following principle adverted to by Fulkes in the present dispute: "It has been held, based on reasoning parallel to that behind the principle in workers' compensation law, that an employer takes his employee as he finds him, and therefore an acceleration or aggravation of a preexisting disability becomes a service-connected injury of that employment [citations] .…" (*Lundak*, *supra*, at p. 1043.)

## II.    Standard of Review in Trial Court and on Appeal

    One of the issues in the present appeal is whether the trial court understood and applied the correct standard of review. Consequently, we shall summarize the standard of review for the trial court, and then articulate our standard of review on appeal.

    When a trial court reviews an administrative decision of a retirement board under Code of Civil Procedure section 1094.5, it applies the independent judgment test. (*Valero, supra*, 205 Cal.App.4th at p. 965; *Alberda v. Board of Retirement of Fresno County Employees' Retirement Assn*. (2013) 214 Cal.App.4th 426, 433 (*Alberda*).) This means the trial court is to weigh the evidence itself, including the credibility of witnesses,

14.

and exercise its own independent judgment on the facts. (*Breslin v. City and County of San Francisco* (2007) 146 Cal.App.4th 1064, 1077; *Alberda*, *supra*, at p. 433.) In doing so, however, the trial court must give "a strong presumption of correctness" to the administrative findings, and "the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817 (*Fukuda*).) Said presumption is "not the same as a substantial evidence review and does not relieve the trial court of its obligation to make its own findings." (*San Diego Unified School Dist. v. Commission on Professional Competence* (2013) 214 Cal.App.4th 1120, 1141; accord, *Alberda*, *supra*, at pp. 435-436 [trial court does *not* defer to the administrative findings whenever substantial evidence supports them; instead, "it must weigh the evidence for itself and make its *own* decision about which party's position is supported by a preponderance"].) That is, "the presumption provides the trial court with a starting point for review—but it is only a presumption, and may be overcome. Because the trial court ultimately must exercise its own independent judgment, that court is free to substitute its own findings after first giving due respect to the agency's findings." (*Fukuda*, *supra*, at p. 818.)

On appeal from the trial court's findings, we apply the substantial evidence test. (*Fukuda*, *supra*, 20 Cal.4th at p. 824.) "'After the trial court has exercised its independent judgment, our task is to review the record to determine whether the trial court's findings are supported by substantial evidence. [Citation.] The trial court's decision should be sustained if it is supported by credible and competent evidence. [Citation.]' [Citation.]" (*Valero*, *supra*, 205 Cal.App.4th at p. 965.) However, we review any questions of law de novo, including the question presented in the instant appeal of whether the trial court applied the correct standard of review. (*Alberda*, *supra*, 214 Cal.App.4th at p. 434.)

15.

### III.   The Trial Court Applied the Correct Standard

The Board contends the trial court did not apply the correct standard of review. We disagree.  While it is true that at the time of the hearing, the trial court asked questions of both counsel to clarify the standard of review, and even requested further briefing on that issue, the trial court's articulation of the standard of review in its written ruling reflected that it had gleaned a correct understanding of the approach it must take. Citing to the key Supreme Court case of *Fukuda*, *supra*, 20 Cal.4th 805, 816, the trial court's ruling accurately stated:  "[Fulkes] bears the burden of proof to show that the administrative findings are contrary to the weight of the evidence.  This court must exercise its independent judgment standard affording a strong presumption that the administrative findings are correct.  [Citations.]"  Additionally, the trial court's extended discussion of that issue included a synopsis of recent case law, such as *Alberda*, *supra*, 214 Cal.App.4th 426.  On the record before us, we conclude the trial court was well-versed on the standard of review.

The Board argues that, even though the correct standard of review was set forth in the ruling, the trial court did not apply or follow that standard of review because it allegedly did not consider all of the evidence in the record.  Again, we disagree.  The trial court's ruling expressly observed that the administrative decision had set forth "an accurate summary of the evidence presented at the hearing" and, therefore, it was "unnecessary to set forth at length those facts here."  The trial court's ability to characterize the accuracy of the hearing officer's summary of the evidence clearly indicated that the trial court did, in fact, review all of the evidence in the record.  Further, although the trial court's ruling was concise, it made reference to a range of evidentiary and factual matters in the record, including Fulkes's two tours of duty in Iraq, the initial symptoms allegedly suffered after he returned from his tours of duty, his application claiming disability due to PTSD and OCD as allegedly contributed to by the work-related

events, and the reports and opinions offered by the two psychological experts, Dr. Barnett and Dr. Munsell. We conclude the trial court *did* consider the entire record.

Finally, the Board argues that the trial court failed to give the administrative findings a strong presumption of correctness. On this point, the Board is engaging in an argument from silence or conjecture, rather than meeting its burden of affirmatively demonstrating error. The mere fact that the trial court's ruling is fairly concise and to-the-point does not mean the trial court failed to accord the administrative decision the required presumption of correctness. Additionally, we note the trial court's ruling *does* explicitly address a major point in the administrative findings—namely, the asserted inconsistency between Fulkes's claim of disability due to exacerbation of PTSD and the fact that he was, at the time of the hearing below, still in the Navy Reserves. The trial court's ruling states, in essence, that the *existence* of the disability was not the issue, but only whether the disability was service-connected: "[T]he question presented is not the disability but the causal connection between the firing range incident and the tire blow out on the one hand and the resulting disability which [the Board] found to be non-service connected." Although other particulars of the administrative findings are not expressly delineated in the trial court's ruling, there is no reason to believe the trial court did not apply the presumption of correctness during the course of its review.

Moreover, as plainly expressed in the ruling, the trial court was aware of its obligation under the standard of review to independently weigh the evidence. The trial court did so, and it came to the conclusion that the weight or preponderance of the evidence was actually in Fulkes's favor in regard to the issue of whether the disability was service-connected, stating: "In applying the independent judgment rule of review, this court concludes that [Fulkes's] disability is service connected." In reaching that conclusion, it is apparent from the discussion set forth in the ruling that the trial court relied to a significant extent upon the opinions of the two expert witnesses, Dr. Munsell and Dr. Barnett. However, the fact that the trial court relied upon and emphasized the

17.

importance of that particular evidence does not mean that other evidence was ignored or that the trial court failed to accord the administrative decision with the required presumption of correctness.

In conclusion, although the trial court's ruling was concise and its discussion was largely confined to certain key points that it believed were the most salient, we are not persuaded from such facts alone that the trial court failed to follow the process that it so carefully outlined at the outset of its discussion. We hold that the Board has not shown that the trial court failed to apply the required standard of review.

## IV. Trial Court's Decision Supported by Substantial Evidence

Once the trial court makes an independent judgment upon the record of an administrative proceeding, the scope of review on appeal is limited—that is, we apply the substantial evidence test. (*San Diego Unified School Dist. v. Commission on Professional Competence*, *supra*, 214 Cal.App.4th at p. 1141.) Our task is to determine whether there is substantial evidence in the record to support the trial court's factual findings. We may not reweigh the evidence, but consider it in the light most favorable to the trial court, indulging every reasonable inference in favor of the trial court's findings and resolving all conflicts in its favor. (*Breslin v. City and County of San Francisco*, *supra*, 146 Cal.App.4th at p. 1078.)

Here, although the administrative decision adopted by the Board discounted the opinions of the two experts, the trial court did not do so. The opinions of both Dr. Barnett and Dr. Munsell constituted substantial evidence in support of the trial court's findings. But, even assuming for the sake of argument that the Board's argument is correct that Dr. Barnett's second report was lacking in adequate factual specificity to support his change of opinion, Dr. Munsell's report and testimony were alone sufficient to support the judgment below. As emphasized in the trial court's ruling, Dr. Munsell, as Fulkes's treating psychologist, provided her expert opinion at the hearing that Fulkes was permanently disabled and that his employment with the Tulare County District

Attorney's Office contributed "'substantially to the disabling condition as a real and measurable factor.'"

## **DISPOSITION**

The judgment of the trial court is affirmed.  Costs on appeal are awarded to Fulkes.


_____
Kane, J.

WE CONCUR:


_____
Hill, P.J.


_____
Gomes, J.